Curtis PEDEN, Appellant,

v.

The STATE of Texas, State.

No. 2–94–160–CR.

Court of Appeals of Texas, Fort Worth.

March 21, 1996.

H.F. Rick Hagen, Hal Jackson, Jackson & Hagen, Denton, for appellant.

Bruce Isaacks, Criminal District Attorney; Kathleen Walsh, Assistant Criminal District Attorney, Denton, for appellee.

Before LIVINGSTON, BRIGHAM and HOLMAN, JJ.

## OPINION

HOLMAN, Justice.

A jury convicted Curtis Peden of murdering Gaylan Gibson with a deadly weapon, a firearm, and assessed his punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. He challenges his conviction in eleven points of error. We reverse and remand.

### The Physical Evidence

Near midnight on January 8, 1990, while driving through Krum, Texas, near an intersection, Cory Yeager saw a pickup truck in a ditch with the lights on. Stopping, he saw a man "slumped over" inside the truck and

some blood. He went to a pay phone, called police, then returned to the truck. Its motor was running, there were holes in the hood and a door, and window glasses were shattered. The man Yeager saw inside the truck was later identified as Gaylan Gibson. He was taken to Denton Regional Hospital and pronounced dead the same night.

Deputy sheriff Roland Ridge, an investigator called to the scene on the night of January 8, 1990, testified that "in the wee hours of the morning," he found three Winchester triple-aught-buck shotgun shell casings on the roadway, "just south of where the pickup was located." The three casings were admitted into evidence.

Dr. Gary L. Sisler, a pathologist and a deputy medical examiner for Tarrant County, testified that he performed an autopsy on the body of Gaylan Gibson on January 9, 1990. He testified that he found a major wound on the body's left shoulder, and that wound extended into the chest cavity, damaging the left lung, the arch of the aorta, the right lung, and ended in the right chest wall. He attributed the cause of the wounds to "a shotgun blast," and testified that the cause of death was loss of blood, secondary to the wounds.

Richard Ernest, senior firearms examiner for the Tarrant County Medical Examiner's crime laboratory, testified that the buckshot pellets and fiber shotgun wadding taken from Gibson's body in the autopsy came from a Winchester 12–gauge triple-aught-buckshot cartridge, fired at a distance of less than ten feet from the victim. He testified that 12–gauge shotgun shells are available in two sizes, one being two and three-fourths inches long, the other being three inches long.

Pawnshop owner Larry McBride testified that Peden came to his shop on December 19, 1989, and bought a "sawed-off," semi-automatic Remington shotgun that would shoot three-inch "magnum" shells containing triple-aught-buckshot. The gun's barrel had been shortened by professional sawing to a length of about twenty inches, and the sale was lawful. McBride testified he had been in business twenty-six years, had sold fifteen or twenty thousand shotguns, and, except for the gun he sold Curtis Peden, had never seen a sawed-off, Remington 1100 semi-automatic shotgun.

The murder weapon was never found, but the court admitted into evidence, for demonstrative purposes and without objection, a Remington 1100 shotgun. Larry McBride testified that, except for a "ventilated rib" and shorter barrel, the shotgun admitted at trial for demonstration was like the one he sold Peden.

### Accomplice Testimony

Eventually, Curtis Peden was charged with Gibson's murder. Michael Murrell was an accomplice. Murrell testified that during the evening of January 8, 1990, while at the Waffle House restaurant in Denton, Peden had offered him $100 to drive Peden "down the road" in Murrell's truck so Peden could fire a gun out the window and "scare" a man who owed him some money. Murrell, who testified he already had consumed eighteen to twenty beers, agreed. Peden put a shotgun in Murrell's truck, and Murrell drove them to a location on Highway 380, where they stopped and waited in the darkness near a mobile home park and a place called the "Last Chance Saloon." Murrell testified that they watched until Gaylan Gibson, alone in his truck, drove from those premises onto Highway 380.

Murrell testified he obeyed Peden's instruction to follow Gibson's truck, then drove alongside Gibson while Peden fired the gun three or four times directly into the driver's window of the Gibson truck. When they returned to the restaurant parking lot, Peden paid Murrell with five twenty-dollar bills.

Several days later, Murrell was arrested for driving with a suspended license. He testified that before being released on bond, a Texas Ranger told him he was suspected of having been the driver of the truck that Gibson was shot from. Murrell testified that after he was released on bond, Peden asked him to take the shotgun and sell it so the police would not find it. Murrell testified that he was unable to sell it and returned the gun to Peden, who later claimed to have "gotten rid of it, it was deep enough they'd never find it."

Michael Murrell also testified that, except for a "ventilated rib" and slightly different barrel length, the shotgun admitted at trial for demonstration was the kind of gun Curtis Peden used in the shooting.

### Insufficient Corroboration Claim

Peden's first point of error is that there was insufficient evidence to corroborate the testimony of accomplice witness Murrell. Point number two protests the trial court's refusal to instruct jurors that an accused's mere presence with an accomplice is, by itself, insufficient corroboration. Points one and two are closely related, and we consider them together.

■ Because accomplice witnesses are considered untrustworthy, their testimony is always looked upon with suspicion. *Holladay v. State,* 709 S.W.2d 194, 196 (Tex.Crim. App.1986). Accordingly, article 38.14 of the Texas Code of Criminal Procedure prohibits conviction only upon the testimony of an accomplice, not corroborated by other evidence tending to connect the accused with the offense. To determine whether there is sufficient corroboration of an accomplice's testimony, the court must view the record as if all accomplice evidence was eliminated and then decide whether other inculpatory facts and circumstances in evidence tend to connect the principal actor to the offense. *Munoz v. State,* 853 S.W.2d 558, 559 (Tex.Crim. App.1993); *Gosch v. State,* 829 S.W.2d 775, 777 (Tex.Crim.App.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993); *Edwards v. State,* 427 S.W.2d 629, 632 (Tex.Crim.App.1968).

■ The State concedes that the only evidence that directly links Peden to the murder is the testimony of his accomplice, Michael Murrell. Therefore our focus is whether the non-accomplice evidence is sufficient to tend to connect Peden with the crime of knowingly and intentionally causing the death of Gaylan Gibson by shooting him on January 8, 1990, with a firearm. There is no precise rule on the amount of evidence necessary to corroborate an accomplice's testimony, so each case must be judged on its own facts. *Gill v. State,* 873 S.W.2d 45, 48 (Tex.Crim.App.1994).

### Non–Accomplice Evidence

■ Hardy Burke, a Denton attorney and resident of Krum, testified that on the night of January 8, 1990, his son telephoned him for help with a flat tire. On the way to meet his son, he drove his white half-cab 1976 Ford Bronco across Highway 380 and noticed a white Chevrolet pickup truck, parked off the road, with two men inside who "appeared to be watching the highway." He testified that although "something about the way the thing looked bothered me," he drove on. After helping his son, he drove home by the same route, followed by his son, who was driving a dark blue Ford pickup. Back at Highway 380, Burke saw the white Chevrolet truck, still parked where he saw it earlier, not far from the mobile home park. It was then around 11:00 p.m. Concerned, he turned around and drove by the site again, followed by his son's truck. Finally, having driven past the parked white truck a total of four times that night, he made note of its license number and went home.

The next day, after learning a murder had occurred in that vicinity the previous night, Burke gave the white truck's license number to the sheriff's department. The number belonged to Michael Murrell's truck. Burke could not identify the faces of the two men he had seen inside the parked truck, but testified that, in the darkness, they appeared to have long hair. When the prosecutor suggested that if either person in the truck was wearing a toboggan hat and turned-up coat collar, that might give them an appearance of having long hair, Burke agreed such a silhouette "could have" appeared to him to be that of persons with long hair. There was no evidence that either Curtis Peden or Michael Murrell had ever worn long hair, and there was testimony that each of them had always worn their hair short.

Murrell testified that his truck was a white, 1974 Chevrolet and that, on the night of January 8, 1990, he was wearing a big coat. He also testified that Peden was wearing a brown jacket and a toboggan cap while they were in Murrell's truck. Murrell also said that while they were waiting for Gaylan

Gibson to leave the area of the mobile home park and saloon,

> [t]here was two vehicles came by us.... One was a four-wheel drive, blue or black Ford, and right behind it, no more than five yards, a white International Scout. The reason I noticed these vehicles that clearly, they passed us, stopped at the stop sign, crossed 380 and went out of sight; but before I could get a good drink of beer, they was coming back and came back the same way they went and passed again and turned around and then stopped and did the same thing again and went out of sight and didn't see them again.

Jerry Simmons testified that during 1990, he had a business called the "Trading Post" and had bought and sold hundreds of shotguns over a period of thirty or forty years. He testified that about the end of January or first of February 1990, Michael Murrell brought him a sawed-off, semi-automatic Remington 1100 shotgun, like the one admitted as the State's demonstrative exhibit, and asked Simmons to buy it. Simmons refused.

The trial court's charge to the jury included the following instruction:

> You cannot convict the defendant upon said Michael Murrell's testimony alone unless you further believe that there is other testimony in the case, outside of the testimony of Michael Murrell, tending to connect the defendant with the offense committed, if you find that an offense was committed. The corroboration of Michael Murrell's testimony is not sufficient if it merely shows the commission of the offense.

### Refusal of Additional Instruction

Peden also asked for this additional instruction, which was refused:

> [M]ere presence of the accused in the company of an accomplice witness shortly before or after the commission of the offense, if any, is not, in itself, sufficient corroboration of the accomplice witness' testimony.

Peden's second point of error is that the court's refusal to include the second instruction was erroneous and that he was harmed because its absence from the charge was calculated to injure his rights, and he timely objected. He argues that he is required to show only that he suffered *some* harm from the court's refusal. *See Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1984). The only example of harm that Peden relates is the following portion of the prosecutor's closing argument at the guilt/innocence phase of trial:

> What else corroborates what Michael tells you? Hippie, Paul Pantel, he remembers that the Defendant came over to the Auto Hospital the day after the murder, they had a conversation.

The State concedes that mere presence of an accused in the company of an accomplice witness shortly before or after the time of the offense is not, in itself, sufficient corroboration of the accomplice witness' testimony. *See Mitchell v. State,* 650 S.W.2d 801, 807 (Tex.Crim.App.1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984).

■ Peden asserts that only accomplice Murrell's testimony places him at the scene of the offense. We note that even if Peden was shown to have been present at the scene of the crime, that is not sufficient, by itself, to corroborate accomplice testimony. *See Golden v. State,* 851 S.W.2d 291, 294 (Tex. Crim.App.1993).

However, the evidence did not raise a defensive theory of the *mere* presence of Peden at the crime scene, and we are guided by *Gill,* 873 S.W.2d at 45.

> We have also repeatedly held that evidence that an accused was in the company of the accomplice close to the time of the offense, *coupled with other suspicious circumstances,* may tend to connect the accused to the offense.

*Id.* at 49 (emphasis added).

We must examine the record for evidence, other than accomplice Murrell's testimony, that Curtis Peden was in Murrell's company close to the time of the offense. If such evidence exists, then we must determine whether there is evidence of other inculpatory facts and suspicious circumstances from which a rational trier of fact could draw reasonable inferences, and that tend to connect Peden to the offense.

The record is clear that, in an effort to persuade the jury that accomplice Murrell's testimony was sufficiently corroborated, the prosecutor's closing argument reminded the jury of considerably more evidence and testimony than only that of "Hippie" Paul Pantel. Early in the argument, the prosecutor told the jury,

> Michael Murrell is telling you the truth about the murder ... [a]nd then we have to bring you corroborating evidence of that, okay, tending to connect the Defendant to the offense.

Arguing Murrell's corroboration to the jury, the prosecutor summarized Murrell's testimony, comparing it with that of Hippie Paul Pantel and other witnesses, including non-accomplices Tom Nabors, Lloyd Ramey, Becky Hansel, Kay McKnight, Hardy Burke, Larry McBride and Jerry Simmons.

The testimony of those witnesses was lengthy. The jury also had evidence from sheriff's investigator Ridge, pathologist Sisler, firearms examiner Ernest and others. We conclude, from the totality of circumstances shown by non-accomplice evidence, and ignoring Murrell's testimony, that a rational trier of fact could reasonably believe that Peden had a relationship with Gaylan Gibson before the murder; that Peden had a motive to commit the offense charged; that Peden bought a sawed-off shotgun that fires the type of shell that killed Gibson; that in the thousands of gun transactions experienced by the pawnshop owner, he had never seen another gun like the one he sold Peden; the autopsy evidence is consistent with Gibson having been shot and killed by the exact kind of shotgun that Peden bought; Simmons was asked to buy that exact kind of shotgun, shortly after the murder. Peden and Murrell kept company with each other almost daily for a period before Gibson was shot and for some time thereafter; and Peden and Murrell went to the Waffle House the night of the shooting.

Without objection, the court instructed the jury:

> you may consider all relevant facts and circumstances surrounding the killing, if any, and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the alleged offense, if any.

The sufficiency of evidence is a question of law, and the issue on appeal is not whether we as a court believe the State's evidence. *See Matson v. State,* 819 S.W.2d 839, 846 (Tex.Crim.App.1991). It is not necessary for non-accomplice evidence to be sufficient in itself to establish the accused's guilt beyond a reasonable doubt, but only that there be *some* non-accomplice evidence that tends to connect the accused to the commission of the offense alleged in the indictment. *Gill,* 873 S.W.2d at 49.

We hold that, excluding accomplice Murrell's testimony, the jury had sufficient evidence of inculpatory facts and suspicious circumstances from which a rational trier of fact could draw reasonable inferences that tend to connect Peden to the commission of the offense. Points of error number one and two are overruled.

### The Hearsay Claim

■ In points of error three and four, Peden admits that certain testimony of non-accomplices Billy Paul Calvert and Dean Haggard was relevant to show motive and the previous relationship between the decedent and Peden under section 19.02 the Texas Penal Code, but complains that it was inadmissible hearsay. Calvert and Haggard testified they were *told* by Gaylan Gibson that he and Peden were dealing drugs. This testimony is hearsay. *See* Tex.R.Crim.Evid. 802.

■ Inadmissible hearsay does not become admissible merely because it is relevant, and the accused's relationship with the victim is not admissible unless it is relevant and thus material to the case. *Werner v. State,* 711 S.W.2d 639, 644 (Tex.Crim.App. 1986); *Richardson v. State,* 860 S.W.2d 214, 216 (Tex.App.—Fort Worth 1993, no pet.). Here the State concedes that what Gibson *told* Calvert and Haggard is hearsay, but says it was rendered harmless by other evidence, admitted without objection, from which the jury could reasonably infer that

Gibson was dealing drugs for Peden. We agree.

Peden's trial court objection did not challenge any non-verbal hearsay attributed to Gibson by Calvert and Haggard, but was singularly and specifically directed at their claims that Gibson *told* them he was dealing drugs for Peden. Points three and four on appeal challenge only verbal hearsay. The record reveals that significant non-verbal hearsay attributed to Gibson by Calvert and Haggard was admitted without objection. Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay. TEX.R.CRIM. EVID. 802.

In addition to what Calvert and Haggard were *told* by Gaylan Gibson, the unobjected-to testimony was that each had seen Gibson in possession of significant sums of money; while showing Calvert the money, Gibson appeared "nervous" and "paranoid"; Haggard had helped Gibson count large sums of money; and Haggard had seen significant quantities of bundled marijuana in the backseat of Gibson's truck.

The court first heard the disputed testimony of Calvert out of the jury's presence. When Calvert finished, Peden's specific objection was directed only to "what Gaylan Gibson told" Calvert. That objection was overruled, but the court granted Peden's request for it to be a running objection once Calvert resumed testifying before the jury. The court also agreed to give jurors a limiting instruction on Calvert's testimony.

Calvert then testified to the jury that, on December 15, 1989, Gibson had shown him stacks of money, in denominations of hundreds, twenties and tens; that Gibson had told him he had gotten marijuana from Peden and had more than enough money to pay for it and to get some more; that Gibson was "nervous" and "paranoid" and looking over his shoulder every time car lights came down the road; that Gibson said he had failed to meet with Peden; and that Peden was looking for him.

At Peden's request, under rule 105(a) of the Texas Rules of Criminal Evidence, the trial judge instructed the jury that this testimony by Calvert,

> shall be considered by you to determine motive, if any, of the Defendant, and further will be considered by you to determine the relationship between the deceased and the Defendant, if any and ... will be considered only for those two reasons.

Next, the court heard Haggard's testimony out of the jury's presence. When Haggard finished, Peden's specific hearsay objection was to "each and every thing that you just testified to here today about the relationship between Gaylan Gibson and Curtis Peden, your knowledge ... is based solely on what Gaylan Gibson told you...." That objection was overruled, but the court granted Peden's request that it be a running objection once Haggard resumed testifying before the jury. The court also agreed to give jurors a limiting instruction on Haggard's testimony.

The jury returned, and Haggard testified that he had counted money for Gibson on two occasions late in 1989, one time a total between $55,000 and $65,000, and another time a total of $85,000, entirely in one hundred dollar bills. Also, Haggard said he had seen large bundles of marijuana in Gibson's truck. He testified that Gibson told him that the marijuana belonged to Peden. After Haggard testified before the jury, Peden did not renew his request for a limiting instruction, and none was given by the judge.

To evaluate the Calvert and Haggard testimony, we must consider the testimony of non-accomplices Becky Hansel, Kay McKnight, Thomas Nabors, and Lloyd Ramey.

Hansel testified, without objection, that she had lived with Gaylan Gibson for awhile. In August or September 1989, she and Gibson were visiting at Haggard's house when Peden drove up and engaged in a "loud discussion" with Gibson. Describing the event, Hansel testified, without objection, "they was getting into an argument." She heard Peden say to Gibson, "[y]ou know I'll do anything to get my money."

Hansel testified that when Peden arrived, she heard Gibson say, "I guess he's here to

jump my ass over the money," to which defense counsel objected as inadmissible hearsay. The court overruled the objection. TEX.R.CRIM.EVID. 803(1) prevents present sense impression from being excluded as hearsay. *Rabbani v. State,* 847 S.W.2d 555 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3047, 125 L.Ed.2d 731 (1993), explains

> The rationale for the exception stems from the statement's contemporaneity, not its spontaneity....
>
> If a person observes some situation or happening which is not at all startling or shocking in its nature, nor actually producing excitement in the observer, the observer may yet have occasion to comment on what he sees ... *at the very time that he is receiving the impression* ... it is believed that such comments, strictly limited to reports of *present* sense-impressions, have such exceptional reliability as to warrant their inclusion within the hearsay exception for Spontaneous Declarations.

*Id.* at 560 (citing Ray, 1A Texas Practice, Law of Evidence, § 916 at 158–59 (3d ed. 1980)).

Kay McKnight testified, without objection, that she is Becky Hansel's adult daughter, was present during the confrontation between Peden and Gibson, and heard Peden say he would do anything to get his money.

Thomas Nabors testified, without objection, that he was Gibson's co-worker at the Denton water reclamation plant and, "[f]our or five times" in the late summer and fall of 1989, saw Peden and Gibson talking in the plant's parking lot.

Lloyd Ramey testified, without objection, that he was Gibson's co-worker at the same plant and, "two or three times" in November and December 1989, saw Gibson and Peden talking at the side of the road that led from the plant to the landfill. Ramey also testified that, in November or December 1989, Gibson "walked in my apartment with a large amount of money ... [h]e said that it was $20,000. And all he did was open the sack, and I looked in it ... and I didn't question him about it ... I just told him I didn't want it in my apartment...."

Peden and the State agree that what Gibson *told* Calvert and Haggard is inadmissible hearsay. Its admission by the trial court was error, and we must determine whether that calls for reversal of the conviction, applying rule 81(b)(2) of the Texas Rules of Appellate Procedure. *Harris v. State,* 790 S.W.2d 568, 584 (Tex.Crim.App.1989).

> If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

TEX.R.APP.P. 81(b)(2).

■ Our harmless error analysis must focus upon the error rather than the propriety of the outcome of the trial, trace its probable impact upon the jury, and determine whether it contributed to the conviction or punishment. *Harris,* 790 S.W.2d at 585–87. Review concentrates on the fairness of the trial and the integrity of the process. *Id.* We consider the source and nature of the error, the extent that it was emphasized by the State, its probable collateral implications, the weight a juror would probably place on the error, and whether declaring it harmless would be likely to encourage the State to repeat it with impunity. *Id.* at 587. This requires us to evaluate the entire record in a neutral, impartial and even-handed manner, not in the light most favorable to the prosecution. *Id.* at 586.

■ There is no formula by which we can perform a harmless error analysis, but generally we first isolate the error and its effects, then ask whether a rational trier of fact might have reached a different result if the error and its effects had not occurred. *Id.* at 587–88. If we are unable to determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment, we must reverse the conviction. *Id.* at 584. However, error regarding improperly admitted evidence can be rendered harmless if like evidence is admitted without objection. *Rogers v. State,* 853 S.W.2d 29, 35 (Tex.Crim. App.1993); *Mayes v. State,* 816 S.W.2d 79, 88 (Tex.Crim.App.1991).

## Contextual Evidence

The statement of facts shows that Peden's trial objection was not just to hearsay, although that is the nominal ground for points three and four on appeal. He also objected to the testimony of Calvert and Haggard on grounds that a balancing test by the court would reveal that the danger of unfair prejudice from their testimony outweighed its probative value. *See* TEX.R.CRIM.EVID. 403. The result of the trial court's balancing test under rule 403 was adverse to Peden.

■■■■ Simultaneously with his objections on grounds of hearsay and rule 403, Peden objected on the basis of TEX.R.CRIM. EVID. 404(b) that evidence of extraneous offenses (Gibson dealing drugs for Peden) is not admissible to prove that he has a general criminal character. An accused may not be tried for some collateral crime or for being a criminal generally. *See Russell v. State,* 598 S.W.2d 238, 250 (Tex.Crim.App.), *cert. denied,* 449 U.S. 1003, 101 S.Ct. 544, 66 L.Ed.2d 300 (1980). Rule 404(b) prohibits the use of such evidence, unless the evidence may also tend to establish a fact of consequence, such as motive or intent, quite apart from its value as character evidence. *See Rogers,* 853 S.W.2d at 35 (Clinton, J., concurring). Thus, evidence of extraneous offenses may be admitted to establish a fact of consequence other than character conformity. *Id.*

■■■■ Because reasonable men may disagree whether in common experience a particular inference is available from the evidence, an appellate court will not disturb a trial court's ruling as long as it is within the zone of reasonable disagreement for the trial judge to find the evidence relevant. *Id.* at 32. On the basis of the trial judge's limiting instruction in the present case, we conclude that his balancing test under rule 404(b) found that motive and the previous relationship between Gibson and Peden, not Peden's character, were the relevant facts of consequence that Calvert's testimony might tend to establish.

When the balancing test is applied, evidence of the context of the offense is almost always admissible under the reasoning that events do not occur in a vacuum and the jury has a right to have the offense placed in its proper setting so that all evidence may be realistically evaluated.... Rarely will the prejudicial value render inadmissible any evidence that is context of the offense.

*Mann v. State,* 718 S.W.2d 741, 744 (Tex. Crim.App.1986) (citations omitted), *cert. denied,* 481 U.S. 1007, 107 S.Ct. 1633, 95 L.Ed.2d 206 (1987).

Evidence to show the context of the offense may be divided into two categories. *See Mayes v. State,* 816 S.W.2d 79, 86–88 (Tex.Crim.App.1991). One is "[s]ame transaction contextual evidence,"

is deemed admissible as a so-called exception to the propensity rule where "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, whether direct or circumstantial, of any one of them cannot be given without showing the others...."

*Id.* at 86 n. 4.

A second category, known as "background" evidence, may refer to other offenses indivisibly connected with the offense charged, or to general background evidence that is helpful to the jury's understanding. *Id.* at 86. *Mayes* also observes that "background" evidence has been admitted not out of necessity, but out of "judicial grace" and because no one objects to it, often allowing proof of facts that do not bear directly on the purely legal issues, but merely fill in the background and give it color. *Id.* at 87.

Background evidence becomes a question for appellate courts if allowed by a trial court to subvert rule 404(b) by letting inadmissible evidence of other crimes, wrongs, or acts prove the accused's character under the guise of "background." *Id.* Nevertheless, the plain language of rule 404(b) does allow a trial court to admit competent evidence of extraneous acts to prove matters other than character, such as an accused's motive, opportunity, intent, preparation, or plan.

■■■ *Ruiz v. State,* 523 S.W.2d 691 (Tex. Crim.App.1975), is a case in which the State's theory was that the accused murdered the victim as revenge for an alleged rape. The

admission of extraneous offense (rape) evidence was upheld. *Id.* at 693–94. A previous difficulty between a defendant and third party may be proved if it led up to the charged offense, involved the victim in any way, or tended to reveal the defendant's motive. *Ingham v. State,* 679 S.W.2d 503, 506 (Tex.Crim.App.1984). Although proof may not be accomplished by inadmissible hearsay, it has long been the law in this state that antecedent quarrels between an accused murderer and the victim are admissible over an extraneous offense objection to show motive for a homicide. *Norwood v. State,* 135 Tex.Crim. 406, 120 S.W.2d 806, 808 (1938).

We conclude that evidence of the previous relationship and antecedent quarreling between Peden and Gibson is proper contextual or "background" evidence as that term is explained in *Mayes.*

As to Calvert, the trial court's instruction limited the jury to considering his testimony only as it might bear on motive and the previous relationship between Peden and Gibson. We must presume the jury followed the judge's instruction. *Gardner v. State,* 730 S.W.2d 675, 696 (Tex.Crim.App.1987), *cert. denied,* 484 U.S. 905, 108 S.Ct. 248, 98 L.Ed.2d 206 (1987); *Alanis v. State,* 891 S.W.2d 737, 742 (Tex.App.—Houston [1st Dist.] 1994, pet. filed). Although allowing Calvert to testify about what Gibson had told him was error, it was cured by the limiting instruction and by the admission of like evidence without objection. We find beyond a reasonable doubt that the error did not contribute to Peden's conviction or punishment.

We have examined the testimony of McKnight and Hansel, who testified before Calvert and Haggard and that of Nabors and Ramey, who testified later. We have examined all of Haggard's testimony that was not subject to Peden's specific hearsay objection and considered it in context with the testimony of Hansel, McKnight, Nabors, and Ramey. We hold that the unobjected-to testimony of Haggard and those other witnesses was sufficient for the jury to draw a reasonable inference that Gibson had been dealing drugs for Peden. We have applied the analysis factors of *Harris,* and hold that the cumulative testimony of these other witnesses rendered harmless the trial court's error in allowing Calvert and Haggard to testify that Gibson *told* them he and Peden were dealing drugs. *See also Chaney v. State,* 775 S.W.2d 722 (Tex.App.—Dallas 1989, pet. ref'd). Points of error three and four are overruled.

### Cross–Examination Issues

Peden's fifth and sixth points of error address the fact that Haggard was on probation for a felony when he testified. Peden asserts he was harmed when the court would not allow cross-examination of Haggard to include questions asking whether his required probation fees had been paid and, if unpaid, to admit that the State had not acted to revoke his probation.

The trial court allowed the defense to ask Haggard whether he was on probation, but not whether he was behind on his payments. Before the jury, Haggard testified he was on probation for possession of cocaine and had plea bargained his case through the district attorney's office.

▆▆▆▆ The general rule is that exposing a witness' motivation for testifying is a proper and important purpose of cross-examination, and all parties are allowed great latitude to show any fact that would or might tend to establish ill feeling, bias, motive, and animus on the part of the witness. *Hilliard v. State,* 881 S.W.2d 917, 922 (Tex.App.—Fort Worth 1994, no pet.). A trial judge has broad, but not unlimited, discretion to determine what is appropriate cross-examination. *Id.*

▆▆▆▆ Before Haggard's cross-examination, the judge conferred with the lawyers out of the jury's presence. Defense counsel told the court that cross-examination of Haggard was expected to elicit answers about past-due probation payments and a lack of any State action to revoke probation. The prosecutor told the court she did not know Haggard's probation status and could take no action against him unless she were notified by the probation department. There was no tender for the court's consideration of any evidence, such as probation department records, to support defense expectations that probation

fees had not been paid, nor was there an offer to call a probation department witness to testify on the matter. There was no discussion of whether Haggard might have a lawful defense to an allegation of unpaid fees or whether the probation department might have lawful reason for not seeking revocation of probation.

 It is proper for a defendant's cross-examination to place a State's witness in his proper setting as to what might motivate him to testify for the State and against the accused. *Miller v. State,* 741 S.W.2d 382, 389 (Tex.Crim.App.1987), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2835, 100 L.Ed.2d 935 (1988). Nevertheless, a trial judge may impose reasonable restrictions on the cross-examination based on concerns such as harassment, prejudice, or confusion of issues. *Id.* In this case the State concedes that it is proper for the jury to be aware that the witness is a convicted felon currently on probation, but asserts that questions about probation fees and the possibility of revocation were not proper under the circumstances. We agree.

Because the trial judge was shown no evidence that the probation payments were in default, we find it reasonable for him to restrict cross-examination to asking whether Haggard was a convicted felon on probation. Without evidence of probation default, it is uncertain whether the proposed inquiries were based on fact or simply a fishing expedition. If no default existed or if the witness denied it, the taint of the questions could remain in jurors' minds, but without proof. Within his discretion, it would be appropriate for the judge to consider that the cross-examination requested by Peden would not resolve whether Haggard had any lawful defense to an alleged non-payment or whether the probation department had lawful impediments to the revocation of his probation. Those matters are questions of law that, without competent evidence, would not be appropriate subject matter for cross-examination in Peden's trial. We hold that there was no abuse of discretion by the trial judge in limiting the cross-examination of Dean Haggard. Points of error five and six are overruled.

## Double Jeopardy Claim

Points of error seven, eight, nine, ten and eleven present procedural and constitutional grounds related to Peden's special plea of double jeopardy. In the course of the investigation into the murder, the police obtained information (especially statements from his alleged accomplice) that indicated that Peden had committed the murder. However, the police also collected information that Peden contends exculpates him, including:

1) the police received a call from a confidential informant who implicated a "David Bartell" in the murder;

2) Paul Calvert said that Gibson had turned him in when he was arrested for cocaine, so he was going to "get Gaylan Gibson";

3) That a "Kevin Holloway" might "be a key in the murder";

4) That a witness had identified the occupants of a vehicle used in the murder as two white males with long hair (Peden did not have long hair at the time of the murder);

5) That Michael Murrell (Peden's alleged accomplice) had originally told police that he was parked on the road where the witness saw him, and was drinking beer with a woman who had long hair.

Before trial, Peden filed a motion that required the State to reveal any evidence it had gathered that would be favorable to him. The State did not reveal any of the information noted above. Peden originally went to trial on December 2, 1991. In the course of that trial, the State first produced the handwritten reports that contained the exculpatory information. Peden's attorneys had the reports copied and began to examine them. The next day, the State learned of the existence of the copies and retrieved all copies. Peden moved for a mistrial, which the court granted.

When the State first moved to re-try Peden, he filed an application for writ of habeas corpus, asserting former jeopardy on grounds that the first trial prosecutor had goaded Peden into moving for mistrial. The trial court issued the writ, but denied the

relief requested, and Peden appealed to this court. This court's unpublished opinion affirmed the trial court's denial.

The current appeal is from Peden's second trial for the alleged offense of murdering Gaylan Gibson. Before the second trial, Peden filed an amended special plea of double jeopardy under TEX.CODE CRIM.PROC.ANN. art. 27.05 (Vernon 1989), alleging the specific instances of prosecutorial misconduct that he says goaded him into moving for the mistrial. The alleged misconduct is that the prosecutor had exculpatory evidence but did not furnish it to Peden before trial, although previously ordered by the trial court to do so. Peden's amended special plea of double jeopardy asserted that the improper withholding of the exculpatory evidence was calculated to cause Peden to ask for a mistrial and prejudice Peden by depriving him of the opportunity to try the case to the jury already impaneled for the first trial.

Peden asks us to find that at the second trial, the State's objection to his amended plea of former jeopardy was untimely (point seven); that the State's objection to that plea had to be written (point eight); that the Fifth and Fourteenth Amendments of the Federal Constitution, and article I, section 14 of the Texas Constitution, do not permit the prior habeas corpus hearing and appeal rulings to *collaterally estop* Peden from re-urging the issue of prosecutorial misconduct (points nine and ten); and that the trial court erred by instructing the jury to disregard Peden's amended plea of former jeopardy and not granting his motion for mistrial in the second trial (point eleven).

The jury for the second trial was seated and sworn late in the afternoon of January 10, 1994. In the jury's presence, the indictment was read, Peden pled not guilty, and the defense attorney requested permission to read to the jury Peden's amended special plea of former jeopardy, which had been filed twelve days earlier. The prosecutor responded that she did not know whether the law permits such a plea to be read to the jury. The judge gave permission. When Peden's attorney finished reading the amended special plea to the jury, the time was 4:35 p.m., and the judge recessed the jury until 9:00 a.m. the next morning. Once the jury left the courtroom, the judge asked the defense attorney for the authority relied on to support reading the amended special plea. Peden's attorney handed the judge a copy of *Collins v. State*, 640 S.W.2d 288 (Tex.Crim. App.1982). The judge left the courtroom immediately, telling the lawyers he would see them at 9:00 a.m. the next day.

The first matter on record the next morning, out of the jury's presence, was the State's request to strike Peden's amended special plea and to have the jury instructed to disregard it. The prosecutor argued that Peden was collaterally estopped from urging the issue of prosecutorial misconduct because it had been litigated previously between the parties. Peden's attorney tendered *Apolinar v. State*, 820 S.W.2d 792 (Tex.Crim.App.1991) to the court as additional authority for reading a special plea of former jeopardy to a jury.

The two cases tendered by Peden at trial make plain that when a defendant relies on a special plea of former jeopardy, any disputed facts underlying the plea are fact questions for a jury to resolve. *Id.* at 793; *Collins*, 640 S.W.2d at 289. TEX.CODE CRIM.PROC.ANN. art. 27.07 (Vernon 1989) mandates that a defendant's claim in the special plea shall not be determined before the trial on the merits.

In *Collins*, unlike Peden's trial, the defendant did not ask to read the special plea to the jury until he had already presented evidence out of the jury's presence two times. *Collins*, 640 S.W.2d at 289. In *Apolinar*, unlike Peden's case, the trial court denied a special plea of former jeopardy in a pretrial ruling. *Apolinar*, 820 S.W.2d at 793. The San Antonio Court of Appeals affirmed the pretrial ruling. Because no statutory provision grants courts of appeals jurisdiction over a special plea before final judgment has been entered, the court of criminal appeals held that Apolinar's interlocutory appeal of the pretrial ruling was premature and vacated the court of appeals' judgment for lack of jurisdiction. 790 S.W.2d 108 (Tex.App.—San Antonio 1990); *Apolinar*, 820 S.W.2d at 794. That opinion also notes that a pretrial writ of habeas corpus is the only procedure available

to protect a defendant's fifth amendment right against double jeopardy. *Id.*

It is clear that once a trial court determines that a special plea presents a claim legally sufficient for submission to a jury, then it must be submitted and tried by the jury together with the plea of not guilty. *Id.*

After hearing from each lawyer, the court determined that Peden's special plea of former jeopardy did not present a claim legally sufficient for submission to a jury. The court granted the State's request, over Peden's objection, and instructed the jury,

> you are instructed to completely disregard and not consider for any purpose all the statements made by Defense Counsel, Mr. Hagen, when he read to you the Defendant's Amended Special Plea of Former Jeopardy yesterday, alleging prosecutorial misconduct, not consider those for any purpose during the course of this trial.

Point of error seven says this instruction was error because the State's objection to Peden's amended special plea of former jeopardy was untimely. Peden argues that the State was required to timely object when the plea was read to the jury at the end of courtroom proceedings on January 10, 1994. The State's objection was not made until court reconvened the next morning.

We have been presented no case law on point, and have found none, addressing the issue of timeliness of the State's objection. On the facts of this case, we conclude that the objection was timely made. Peden's attorney read the special plea to the jury at the close of the day's court session; the prosecutor told the court she was unfamiliar with law governing such a procedure; the judge asked for and received supporting case law tendered by Peden's attorney, then took it for review and immediately adjourned court. As soon as court reconvened the next morning, the State objected by moving to strike and to instruct the jury to disregard. No substantive business of the trial intervened between the reading of Peden's special plea at day's end and the State's objection the following morning. We hold that, on

these facts, the State's objection was timely made.

Point of error eight contends that the instruction was error because the State's objection was presented orally. Peden argues that the oral presentation waived the State's objection because TEX.CODE CRIM.PROC.ANN. arts. 27.10, 28.12 (Vernon 1989) require such objections to be in the form of a written pleading known as an "exception."

Article 27.10 provides:

> All motions to set aside an indictment or information and all special pleas and exceptions shall be in writing.

TEX.CODE CRIM.PROC.ANN. art. 27.10 (Vernon 1989).

Article 28.12 provides:

> When a special plea is filed by the defendant, the State may except to it for substantial defects. If the exception be sustained, the plea may be amended. If the plea be not excepted to, it shall be considered that issue has been taken upon the same. Such special pleas as set forth matter of fact proper to be tried by a jury shall be submitted and tried with a plea of not guilty.

TEX.CODE CRIM.PROC.ANN. art. 28.12 (Vernon 1989).

We have been presented no case law, and find none, construing whether articles 27.10 and 28.12 mean that the State's objection had to be in writing. The State asserts that, in construing a statute, the court must consider the object the statute seeks to attain. *See* TEX. GOV'T CODE ANN. § 311.023 (Vernon 1988) (Code Construction Act).

We first consider article 27.10, a component of chapter 27 of the Texas Code of Criminal Procedure. We recognize that the primary pleading in a criminal action on the part of the *State* is the indictment or information. TEX.CODE CRIM.PROC.ANN. art. 27.01 (Vernon 1989). The code lists a *defendant's* pleadings as including a *motion to set aside,* an *exception to an indictment or information* and *special pleas* allowed by article 27.05, such as a plea of former jeopardy. *Id.* art. 27.02. Those are the only three types of pleadings that are the subject of article 27.10.

In chapter 27, articles 27.08 and 27.09 describe the manner in which a defendant is required to except to an indictment. Although article 27.10 requires written pleadings, its text does not contain the word *State* or *defendant*. It is followed by articles 27.11 and 27.12, which address, only for a defendant, the number of days allowed for filing those written pleadings. The texts of articles 27.11 and 27.12 do not mention the State. We conclude that, except for article 27.01, which merely classifies an indictment or information as being pleadings of the State, the rest of chapter 27 mandates requirements for defendants, not for the State. We conclude that, from the context of its wording, the object that article 27.10 seeks to attain is to articulate an instruction for an accused who desires to challenge an indictment or information, admonishing that whether the challenge is by motion to set aside, by special plea, or by exception, it must be in writing.

We construe article 27.10 as applicable to challenges to an indictment or information. We construe article 27.10 as not imposing any requirement on the State's objections to a special plea by which a defendant has challenged an indictment or information. We hold that article 27.10 did not require the State to present a written exception to Peden's amended special plea of former jeopardy, and the State's oral objection was sufficient.

A literal reading of article 28.12 reveals no requirement that the State's objection to a defendant's special plea be in writing. We construe article 28.12 as imposing no requirement of a written exception by the State to Peden's amended special plea. We hold that the State's oral objection was sufficient.

Accordingly, we overrule points of error seven and eight.

### Constitutional Issues

Point of error nine is that both the fifth and fourteenth amendments to the United States Constitution forbid the State to use the principle of collateral estoppel against an accused. Point of error ten is that article I, section 14 of the Texas Constitution also forbids it. We consider these points together.

> Collateral estoppel has been described as,
>
> an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

*Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469, 475 (1970). Chief Justice Burger observed that courts applying collateral estoppel to criminal cases,

> would certainly not apply it to *both* parties, as is true in civil cases, *i.e.,* here, if Ashe had been convicted at the first trial, presumably no court would then hold that he was thereby foreclosed from litigating the identification issue at the second trial.

*Id.* at 464–65, 90 S.Ct. at 1205, 25 L.Ed.2d at 487 (Burger, C.J., dissenting).

Peden's emphasis under points nine and ten is that he now urges a special plea of former jeopardy; to support the plea, he alleges facts of prosecutorial misconduct from the first trial that goaded him into moving for a mistrial; that questions of the alleged misconduct are for the jury to decide; and that the State may not use collateral estoppel to prevent his presentation of those facts to the jury.

The State counters that Peden's second trial is simply a continuation of his original case; that without a finding of prosecutorial misconduct, no factual grounds support his special plea; that, following the mistrial, Peden unsuccessfully sought release through writ of habeas corpus by alleging the same prosecutorial misconduct that goaded him into moving for mistrial; and that this court of appeals has already ruled adversely to him on that point, specifically holding that the prosecutor's conduct complied with Tex. R.Crim.Evid. 614(a) and (d), was not improper, and could not have been solely intended to provoke Peden into moving for a mistrial *Ex parte Peden,* No. 02–92–059, slip op. at 4 (Tex.App.—Fort Worth May 5, 1993) (not designated for publication).

■ The general rule is that unpublished opinions may not be cited as authority by counsel or by a court to support positions taken in similar cases. Tex.R.App.P. 90(i). However, we find no statute, rule or case law that forbids us from taking judicial notice of our unpublished opinion from a prior appeal and resolving the parties' dispute over whether our unpublished ruling is binding when we consider a later appeal of the same case.

The State argues that in Peden's habeas corpus appeal, the facts alleging prosecutorial misconduct were identical to those he now urges; but the ultimate question decided by this court in the habeas corpus appeal was whether prosecution is barred by his plea of former jeopardy, a question of law, not fact. Therefore, the State contends the "law of the case" doctrine means this court of appeals already has adjudicated the issue of double jeopardy in this case, and it may not be relitigated by the parties. The State says that, as to the double jeopardy issue, the "law of the case" doctrine was established in the habeas corpus appeal and will continue to govern this case through its subsequent stages. In general, we agree with the State's argument.

■ The law of the case doctrine is applicable to the appeals of criminal cases. *Ware v. State*, 736 S.W.2d 700, 701 (Tex. Crim.App.1987). However, the law of the case "is required by neither constitution nor statute," and "should be disregarded when compelling circumstances require a redetermination of the point of law decided on the prior appeal." *Ex parte Granger*, 850 S.W.2d 513, 516 (Tex.Crim.App.1993). The question to reconsider an issue on a second appeal must always be addressed to the discretion of the court and determined according to the particular circumstances of the case. *Id.* The "particular circumstances" of this case include a fundamental change in the underlying law upon which we based our original decision. Consequently, if this fundamental change applies to this case, there are "compelling circumstances" to re-examine our original holding.

At the time the original habeas corpus appeal was decided, this court followed the federal standard that if a prosecutor intentionally provokes a defendant into a mistrial, the Fifth Amendment of the United States Constitution bars a defendant's retrial for the same offense. *Oregon v. Kennedy*, 456 U.S. 667, 671, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416, 421 (1972). We found that the prosecutor's conduct did not intentionally provoke the mistrial and thus affirmed the trial court. Points of error seven through eleven do not directly assert that former jeopardy bar, nor do they ask us to decide whether article I, section 14 of the Texas Constitution applies in exactly the same way as the federal constitution's Fifth Amendment. However, on December 6, 1995, (after the habeas corpus appeal) the Court of Criminal Appeals handed down *Bauder v. State*, No. 1058–94[, 1995 WL 713030] (Tex.Crim. App. Dec. 6, 1995), which materially altered the basis on which we rendered our decision.

■ The *Bauder* court determined that under article I, section 14 of the Texas Constitution, a prosecutor's specific motive is irrelevant when his actions force the defendant to obtain a mistrial. *Id.,* slip op. at 3. It held that:

> a successive prosecution is jeopardy barred after declaration of a mistrial at the defendant's request, not only when the objectionable conduct of the prosecutor was intended to induce a motion for mistrial, but also when the prosecutor *should have known* that an objectionable event for which he was responsible would require a mistrial at the defendant's request.

*Id.* at 5 (emphasis added).

This holding departed from the Court's prior application of the federal standard. *Id.,* at 1, 3; *see also Collins*, 640 S.W.2d at 290. It was this previous standard that the trial court applied in its habeas corpus hearing. We also applied the previous standard in our affirmance of the trial court's judgment. *Ex parte Peden*, No. 02–92–059, slip op. at 4. Consequently, if the court's holding in *Bauder* applies to this case, then we, like the Fourth Court of Appeals in the *Bauder* case, "did not employ the legal analysis appropriate to appellant's Texas constitutional claim." *Bauder*, slip op. at 7.

The *Bauder* court did not rule as to whether its decision would be applied prospectively or retrospectively. To determine whether the decision in *Bauder* applies to this case, we examine the Court of Criminal Appeals' discussion of retrospectivity in *Geesa v. State*, 820 S.W.2d 154, 163–65 (Tex.Crim.App. 1991). In *Geesa* the court discussed four variations that have been used in determining how to apply new case law. *Id.* at 163 (see especially n. 13). While declining to do so in that case, the court stated "[i]n general, we agree with the Supreme Court's rationale in *Griffith* where the Court adopted the 'limited retrospectivity' approach." *Id.* at 165 (citing *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)). Finding in this case that Peden is a "similarly situated defendant" and that "actual inequity" will result if we do not allow him to receive the "benefit of the new rule," we hold that the *Bauder* decision is to be applied with "limited retrospectivity."[1] *Geesa* at 165 (citing *Griffith*, 479 U.S. at 323, 107 S.Ct. at 713, 93 L.Ed.2d at 658–59). Consequently, our review of the trial court's decisions as to Peden must apply the analysis required by *Bauder*.

 In the original habeas corpus proceeding, the trial court found that the State "did not act in bad faith or deliberate or intentional acts [sic] that constituted gross prosecutorial action." Under the analysis required by *Bauder*, we find that a fact issue remains as to whether the prosecutor "should have known" that her actions would goad Peden into requesting a mistrial. While Peden couches his argument in terms of collateral estoppel, we need not rule on the issue as such because the fact issue raised by a *Bauder* analysis was never decided by the trial court. Thus we believe it would be an abuse of our discretion to allow the law of the case to bar Peden from presenting his special plea to the jury for a finding on that fact. *See Ex parte Granger*, 850 S.W.2d at 516. Accordingly, we sustain Peden's tenth point of error.

We reverse the trial court, and we remand the case for a new trial, including a resolution of the issue raised in Peden's special plea. *Apolinar*, 820 S.W.2d at 793–94; *Collins*, 640 S.W.2d at 290–91.

---

1. "[A]pplying the new rule to all cases then pending on direct review or not yet final, as well as [to the parties in the case in which the new rule is announced and to those cases tried after the effective date of the rule]." *Geesa*, 820 S.W.2d at 163 n. 13.