

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-17-00028-CR

EUNICE CRISTINA RODRIGUEZ                                          APPELLANT

V.

THE STATE OF TEXAS                                                STATE

----------

## FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY
## TRIAL COURT NO. 1447239R

----------

## MEMORANDUM OPINION[1]

----------

Appellant Eunice Cristina Rodriguez appeals from her felony-murder conviction for which she received a life sentence. In five points, she challenges the denial of her pretrial motion to suppress, the jury charge, and the sufficiency of the evidence to support her conviction. Because sufficient corroborating evidence supported Rodriguez's conviction, rendering the absence of a charge

---

[1]*See* Tex. R. App. P. 47.4.

instruction on corroborative testimony not egregiously harmful, and because Rodriguez did not preserve her appellate suppression argument in the trial court, we affirm the trial court's judgment.

## I. BACKGROUND

### A. THE MURDER

Tommy Brown, who worked as a night cleaner for a Fort Worth janitorial-services company, was in a relationship with Connie Moreno.[2] Moreno was a "very petite," Hispanic woman whom Brown regularly introduced as his wife although they apparently were not married. In 2003 or 2004, Brown also became involved with Rodriguez, who was taller than Moreno, heavier set, and Hispanic.[3] Brown referred to Rodriguez as his girlfriend to some, but he told his sister Andrea Brown that he was only "trying to help [Rodriguez] out." Brown told Andrea that Rodriguez was from El Paso.

In early 2013, Rodriguez met Brayden Ellis on a bus trip to her hometown of El Paso and they became romantically involved. Ellis found out about Rodriguez's relationship with Brown in March or April of 2013. Ellis eventually moved to El Paso to be with Rodriguez but they returned to the Fort Worth area in July 2013. Rodriguez and Ellis then planned to move to Georgia to live with

---

[2]In the record, her last name is also spelled "Marino."

[3]Brown shared with a co-worker that his personal life was "a mess."

2

his mother, and Rodriguez told Ellis that she wanted to talk to Brown before they moved.

On Thursday, September 5, 2013, Ellis dropped off Rodriguez near Brown's home. Rodriguez later called Ellis to tell him that Brown had slapped her and that she was pregnant with Ellis's child. Ellis became angry, threatening to drive there and "beat [Brown] up," and Rodriguez told Ellis that she would "take [Brown's] things."

According to Ellis, he drove his Dodge Intrepid to Brown's neighborhood late that night and waited until Rodriguez texted him to come to Brown's home. When Rodriguez let Ellis into Brown's home, Brown was gone. Ellis hid in a back bedroom for "a real long time." During this time, Brown returned and he and Rodriguez left together. When they returned, Ellis grabbed a toilet-tank lid from a nearby bathroom and hit Brown in the head, breaking the lid and deeply cutting Ellis's right hand. Ellis began punching Brown with his fists until Brown fell to the floor. Rodriguez then handed Ellis a pot and said, "Here, use this."

Ellis hit Brown in the head three times with the pot and then tied Brown's hands behind his back with one of Brown's shoelaces. Rodriguez told Ellis to put a bag over Brown's eyes, which he did. Rodriguez taped Ellis's injured hand and "cleaned up what she could clean up" with bleach. Rodriguez wore "see-through medical gloves" while cleaning up.

Rodriguez told Ellis that she was going to take Brown's truck and television but that she needed to get some other "things" as well. Ellis left with the

3

television, believing that Brown was still alive. Ellis put the television in Brown's truck and then sat in his Intrepid. After about five minutes, Ellis drove away, and Rodriguez pulled up behind him in Brown's truck. At a nearby convenience store, Ellis and Rodriguez moved the television and "a few bags" to the Intrepid and drove away together in the Intrepid, leaving the truck with the keys in it. Ellis discovered that Rodriguez also had taken Brown's cell phone and wallet. The pair then drove to Ellis's hotel, where he threw away his bloody clothes, and then drove to a hospital to get his hand treated.

### B. THE INVESTIGATION

Two days later, Andrea went to Brown's home to check on him after a neighbor reported that she had not seen Brown for a few days, which was unusual. Indeed, Andrea had not seen Brown since September 2 and had unsuccessfully tried to contact him by text the morning of September 7: "call me ASAP." She found Brown lying face down on the floor of the hallway bathroom with his hands tied behind his back with a black shoelace. It appeared he had been doused with bleach because his clothes were discolored. There was a plastic bag over his head secured by duct tape wrapped around his lower face and neck eleven times. There was a second plastic bag underneath this bag. Brown had several head injuries caused by blunt-force trauma, injuries to his neck muscles and hyoid bone, and nine rib fractures. There were bloody shoe prints in the kitchen "with distinctly different tread patterns," and the hallway walls were spattered in blood.

Andrea called the police. Officers arrived and noted that Brown's truck and television were missing and that a toilet tank was missing its lid. A responding officer recalled having Brown's truck towed on the morning of September 6 from a nearby convenience store where it had been found abandoned with the keys in it. When officers checked the truck, they found a plastic bag containing pieces of a toilet-tank lid, a shoe, and a belt. The items tested positive for blood. Rodriguez, Ellis, and Brown could not be excluded as contributors to the mixed DNA profile found on the belt.

While the lead detective, Thomas O'Brien, was driving Andrea to the police station to interview her, she received a text message from Brown's phone, apparently in response to her earlier text: "Im driving to El Paso what u want?" O'Brien instructed Andrea how to respond: "ok call me when u get back. Have a safe trip." Andrea gave O'Brien Rodriguez's name and mentioned that she was from El Paso. O'Brien determined that Rodriguez had "an extensive criminal history," including a 2003 conviction for aggravated robbery.

O'Brien spoke with two of Brown's neighbors, Billy Henderson and Willie Wingfield. Wingfield stated that on the night of September 5, he saw Brown leave and a "female who is taller and heavier set [than Moreno] walk a stranger into the house." He was sure that the woman was not Moreno. He described the stranger as a tall, black man with braided hair. Wingfield did not recognize the stranger but knew he did not "belong there." When Brown returned, Wingfield saw Brown be forcibly "yanked" inside the house. That was the last time

5

Wingfield saw Brown. The next morning, Wingfield noted that Brown was not smoking on his front porch as was his habit.

Henderson also last saw Brown on the night of September 5. He saw Brown and his tall, Hispanic girlfriend go into Brown's home. After Brown left, Henderson saw a tall, black man with glasses and braids go into the home. Wingfield was unable to pick Rodriguez's photo out of a photo array as the person he saw with Brown that night.[4] Similarly, another neighbor of Brown's, Keith Moultry, did not choose Rodriguez's photo when asked to identify the woman he saw Brown with on September 5. Both Wingfield and Moultry chose the same "filler" photo.

O'Brien reviewed security video for the business Brown cleaned the night of September 5 and saw Brown and Rodriguez arrive together at 10:10 p.m. and leave at 10:56 p.m. Brown was wearing the same shirt in the video that he was found murdered in. Because Brown's wallet was not found at the scene, O'Brien began tracing Brown's debit card through bank records and security video from the businesses where the card was used. O'Brien discovered that Rodriguez and Ellis began using Brown's debit card in the early morning hours of September 6 through September 7, moving east from Fort Worth into Mississippi, until Brown's money was gone.

---

[4]The photograph O'Brien used of Rodriguez was from 2003.

O'Brien searched police reports for Brown's address and found that Brown had accused Rodriguez of theft earlier that year, in July 2013. Brown had reported that he believed Rodriguez had taken his wallet and that when he called Rodriguez to confront her, Rodriguez threatened to send "her male friend" to Brown's house to "kick his ass." Brown heard a male laughing in the background during the call.

On September 8, O'Brien swore to these facts in an affidavit, stating that he had "good reason to believe" that Rodriguez committed the capital murder of Brown and seeking an arrest warrant. A magistrate signed a warrant authorizing Rodriguez's arrest that same day. *See* Tex. Code Crim. Proc. Ann. art. 15.03 (West 2015).

Three days after Andrea found Brown's body—September 10—O'Brien interviewed Deborah Grimes, the bookkeeper at the janitorial-services company Brown worked for. Grimes had been receiving and sending texts to Brown's cell-phone number after his murder. She had texted Brown on September 7 after he did not show up to a September 6 cleaning assignment: "Call me." She received a reply text from Brown's number, "Im driving to El Paso had a emergency." She responded, "Your buildings are covered for the weekend. Call me as soon as you get back." Brown's number replied, "Thank you. So much." Grimes then asked where Brown's vacuum cleaner was but received no immediate response.

Two days later on September 9, the texter using Brown's number told Grimes he would "be back no time soon," explained that he had lost his wallet

7

and was "low in cash," asked to borrow money, and requested that she send "the money to my causin [sic] his name is Braylon Ellis." On September 10, Grimes texted Brown to tell him that she was worried about him and asked if he still wanted his paycheck to be sent to Braylon Ellis. Brown's number responded, explaining that he could only text and not call from the phone because it had been dropped and asking that the money be sent to his cousin by money gram.

The police then tracked the location of Brown's phone to "just outside of Atlanta, Georgia." Rodriguez and Ellis were arrested in Georgia on September 10 under two Texas arrest warrants.[5] Rodriguez had dyed her brown hair blonde. O'Brien flew to Georgia and obtained a search warrant for Ellis's stepfather's house, which is where Rodriguez and Ellis had been staying, and for Ellis's Intrepid. *See id.* art. 18.01 (West Supp. 2017). O'Brien's supporting affidavit was nearly identical to the affidavit he submitted to support his request for an arrest warrant. In the bedroom Rodriguez and Ellis had shared in the home, officers found Brown's driver's license in a wallet in a bag, Brown's cell phone "hidden . . . kind of at the back of the dresser,"[6] and clothes matching the clothes seen on Rodriguez and Ellis in the security videos as they were using Brown's debit card. In Ellis's Intrepid, officers found Brown's debit card, an

---

[5]At the time of his arrest, Ellis was wearing glasses and had his hair in braids.

[6]O'Brien was able to find Brown's phone by calling Brown's number and hearing it ring from the back of the dresser.

envelope with Rodriguez's name on it, and "additional paperwork" with Brown's name. The only fingerprint found on Brown's phone matched Rodriguez's prints. Officers also found Ellis's discharge instructions from the Dallas hospital Ellis went to for treatment for a "Dog bite, hand" on September 6 at 4:14 a.m.

### C. PRETRIAL AND TRIAL

Rodriguez was indicted with the capital murder of Brown. *See* Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2017). While she was in jail awaiting trial, Rodriguez discussed details of her involvement in Brown's murder with Mecca Fisher, a fellow inmate:

> [Rodriguez] said that her and [Ellis] were going to rob [Brown]. She said that she left the house while he was supposed to do it. And when she got back [Brown] was still alive.[7] She said that [Ellis] was really upset and crying and she said that he was a stupid [expletive]. He was weak and he couldn't finish it. So she said she [finished it].

Rodriguez also told Fisher that they tied Brown up, beat him, and took his credit cards and truck before leaving for Georgia. Rodriguez stated that she planned the entire thing. To Fisher, Rodriguez seemed to be bragging about her involvement and was confident that no physical evidence—fingerprints, footprints, or blood—would be found at Brown's house to connect her to the offense.

Rodriguez filed a motion to suppress all evidence obtained as a result of the Texas arrest warrant and the Georgia search warrant, complaining that

---

[7]Rodriguez knew Brown was alive because he was making "[m]oaning, gurgling sounds."

9

O'Brien omitted material facts in his supporting affidavits. Specifically, Rodriguez pointed to the fact that O'Brien did not disclose that Wingfield and Moultry failed to pick Rodriguez's photo from the photo array. Rodriguez argued to the trial court that these omissions in O'Brien's affidavits vitiated any probable cause to support issuance of the warrants. The trial court denied Rodriguez's motion:

> And the Court is not going to overturn the magistrate[s'] decisions [to issue the warrants]. The Court likewise is going to make a finding that Officer O'Brien did not act in bad faith when he did the affidavit. That even though some things might have been left out, there was still adequate probable cause based upon the discussions that he had with [Andrea] together with the text messages that [s]he had received . . . and also the accusations by Mr. Brown concerning Ms. Rodriguez'[s] threatening him and also stating that she would have a guy come and do bodily harm to him, . . . but based upon that, the Court's going to deny the motion to suppress.

## D. APPEAL

The jury found Rodriguez guilty of the lesser-included offense of murder and assessed her punishment at confinement for life.[8] *See id.* § 19.02(b) (West 2011). She filed a motion for new trial, arguing that the verdict was contrary to the law and evidence, which was deemed denied. *See* Tex. R. App. P. 21.3(h), 21.8(c). Now on appeal, Rodriguez raises five points containing two main arguments: (1) the evidence was insufficient and the jury charge was egregiously harmful because neither Fisher, a jail informant, nor Ellis, Rodriguez's

---

[8]Her punishment was enhanced after the State notified the court that Rodriguez was a repeat offender based on her 2003 aggravated-robbery conviction. *See* Tex. Penal Code Ann. § 12.42(c)(1) (West Supp. 2017); *Brooks v. State*, 957 S.W.2d 30, 33 (Tex. Crim. App. 1997).

accomplice, may be corroborated by the other and (2) any evidence obtained as a result of the arrest and search must be suppressed because O'Brien made "material and intentional misrepresentations" in his affidavits that attempted to establish probable cause.

## II. CORROBORATION

In her first two points, Rodriguez argues that because Fisher and Ellis cannot corroborate each other and because the remaining evidence is insufficient to support her conviction, it must be reversed. This argument turns on whether the testimony of a jail informant may be corroborated by an accomplice witness and vice versa. In a related point, she asserts that the jury charge was egregiously harmful because it failed to instruct the jury that Fisher and Ellis could not corroborate each other.

### A. SUFFICIENCY

The code of criminal procedure prohibits a conviction based solely either on an accomplice witness's testimony or on a jail informant's testimony unless the testimony is "corroborated by other evidence tending to connect the defendant with the offense committed." Tex. Code Crim. Proc. Ann. art. 38.075(a) (West Supp. 2017), art. 38.14 (West 2005). Corroboration of either accomplice or informant testimony is not sufficient if such corroborating evidence shows nothing more than the commission of the offense. *Id.* arts. 38.075(b), 38.14. The court of criminal appeals has held that the testimony of one accomplice witness cannot corroborate the testimony of another accomplice.

11

*Chapman v. State*, 470 S.W.2d 656, 660 (Tex. Crim. App. 1971). But whether

accomplice and informant testimonies may corroborate each other appears to be

an open question. *See Lorence v. State*, No. 02-15-00398-CR, 2017 WL

4172077, at *5 (Tex. App.—Fort Worth Sept. 21, 2017, pet. ref'd) (mem. op. on

reh'g, not designated for publication). Judge Barbara Hervey has noted that the

plain language of articles 38.075 and 38.14 seem to allow such cross-

corroboration, although she acknowledged this result seemed counterintuitive:

> The corroboration requirement in both statutes refers to "other evidence," but the statutes do not refer to each other. The "other evidence" requirement makes sense when there is testimony at trial from only an accomplice or a "jail house" informant, but what if there is—as in this case—testimony from an accomplice and a "jail house" informant? Can the accomplice's testimony corroborate the "jail house" informant's testimony and vice versa? The language of the statutes indicate that they could, but I am not convinced that is what the legislature intended because such an interpretation would seem to undermine the policy reason for the existence of both statutes. If the statutes exist to ensure that a person is not convicted on only unreliable testimony, why would it be okay to allow that so long as two unreliable witnesses testify instead of only one?

> Perhaps the legislature considered this possibility and rejected it, although the legislative history does not indicate that is so. It is also possible, however, that the legislature did not consider such a scenario. Neither the judiciary nor the legislature has the ability to foresee every conceivable consequence of a law, and while it is not for the judiciary to add or subtract from lawful statutes enacted by the legislature, the legislature may want to consider examining the interplay between these two statutes to ensure that they operate as intended when there is accomplice and "jail house" informant testimony in the same case.

*Mata v. State*, 542 S.W.3d 582, 583 (Tex. Crim. App. 2018) (Hervey, J., concurring op. to refusal of pet.) (internal citation omitted).[9] And the intermediate appellate courts have reached differing conclusions on the issue. *See Lorence*, 2017 WL 4172077, at *5 (discussing split of authority).

While we recognize that whether Fisher and Ellis could corroborate each other is an open question, we need not definitively decide it today. When evaluating the sufficiency of corroboration evidence we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). The corroborating evidence need not prove the accused's guilt beyond a reasonable doubt nor does it have to directly link the accused to the commission of the offense. *Casanova v. State*, 383 S.W.3d 530, 538 (Tex. Crim. App. 2012); *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008); *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999). All that is required is that the non-accomplice evidence link the accused in some way to the crime, allowing a rational fact-finder to conclude that the non-accomplice evidence sufficiently tended to connect the accused to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). Even apparently insignificant

---

[9]Three judges joined Judge Hervey's concurring opinion in *Mata*—Judges Bert Richardson, David Newell, and Scott Walker.

incriminating circumstances may afford the requisite corroboration as long as the combined weight of these circumstances tends to connect the accused to the offense. *Cathey*, 992 S.W.2d at 462; *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999); *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997). This standard is the same for corroboration of informant testimony. *Lorence*, 2017 WL 4172077, at *6.

By eliminating the evidence provided by Fisher and Ellis, we conclude that the remaining evidence tended to connect Rodriguez to Brown's murder such that Fisher's and Ellis's testimonies were sufficiently, independently corroborated. The night of the murder, security video of the business Brown cleaned showed Brown and Rodriguez arrive and leave together. Brown's neighbors saw him at his home that night accompanied by a Hispanic woman who was not Moreno, and also saw the woman allow a man into Brown's home after Brown left. When Brown returned, one neighbor saw that he was forcibly "yanked" into his home.

After Brown's truck was found, the belt in the truck tested positive for the presence of blood, and neither Ellis nor Rodriguez could be excluded as a contributor to the mixed DNA profile. Security video showed Rodriguez and Ellis using Brown's debit card beginning shortly after the murder and continuing until Brown's account was drained, which occurred when Rodriguez and Ellis were in Mississippi. While Rodriguez and Ellis were on the move, Andrea received a text message from Brown's phone number, saying he was traveling to El Paso with his "girl." Andrea informed O'Brien that Rodriguez was from El Paso. Grimes

14

also received text messages from Brown's phone number in which the sender asked Grimes to send money to Ellis.

When Rodriguez and Ellis were arrested in Georgia at Ellis's stepfather's house, Rodriguez had dyed her hair blonde and Brown's wallet, driver's license, and phone were found in the bedroom Rodriguez had been staying in with Ellis. Rodriguez and Ellis were located after law enforcement tracked the location of Brown's phone by cell-tower information. Brown's phone was hidden in the back of a dresser, and the only fingerprint found on the phone was Rodriguez's. Clothes matching the clothes Ellis and Rodriguez were seen wearing while using Brown's debit card were found in the bedroom. In Ellis's Intrepid, the vehicle seen in surveillance videos when Brown's credit card was used, officers found Brown's debit card, an envelope with Rodriguez's name on it, and "additional paperwork" with Brown's name, including handwritten notations of Brown's bank-account information and driver's license number.

This evidence and the inferences that could be reasonably drawn from it tended to connect Rodriguez to Brown's murder and thus were sufficient to corroborate Fisher's and Ellis's testimonies even if they could not corroborate each other. *See, e.g.*, *Castillo v. State*, 221 S.W.3d 689, 691–93 (Tex. Crim. App. 2007); *McDuff*, 939 S.W.2d at 612–13; *Spiers v. State*, 543 S.W.3d 890, 892–96 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd); *Campos v. State*, 473 S.W.3d 907, 915–16 (Tex. App.—Amarillo 2015, no pet.); *Hernandez v. State*, 327 S.W.3d 200, 207–08 (Tex. App.—San Antonio 2010, pet. ref'd);

15

*Peden v. State*, 917 S.W.2d 941, 945–47 (Tex. App.—Fort Worth 1996, pet. ref'd). We overrule Rodriguez's first two points.

## B. JURY CHARGE

Rodriguez asserts in her fifth point that she was egregiously harmed by the absence of a jury instruction that explained Fisher's and Ellis's testimonies could not be cross-corroborated. Indeed, because Rodriguez did not object to the jury charge on this basis, she must show egregious harm arising from the absence of an instruction under either article 38.075 or article 38.14. *See Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013). Even assuming error in the absence of such an instruction, Rodriguez cannot show such harm because the jury heard sufficient corroborating evidence apart from the evidence provided by Fisher and Ellis and because that corroborating evidence was not "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991); *see also Phillips v. State*, No. 10-12-00164-CR, 2015 WL 7443625, at *1–3 (Tex. App.—Waco Nov. 19, 2015, pet. ref'd) (mem. op., not designated for publication); *Brooks v. State*, 357 S.W.3d 777, 781–82 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). In short, the absence of such instruction, even if error, was harmless. *See Washington v. State*, 449 S.W.3d 555, 571–72 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We overrule point five.

### III. MOTION TO SUPPRESS

In her third and fourth points, Rodriguez argues that the trial court erred by denying her motion to suppress her arrest warrant and the search warrant for Ellis's stepfather's home in Georgia because O'Brien made material misrepresentations of fact in his supporting affidavits. *See* Tex. Code Crim. Proc. Ann. art. 15.05 (West 2015), art. 18.01(b). She argues that O'Brien "misstated" in the affidavits that Wingfield and Henderson identified Rodriguez as the person who admitted another man into Brown's home while Brown was gone, falsely implying that Rodriguez "had walked the murderer into Tommy Brown's home."[10] In reviewing the trial court's ruling on Rodriguez's motion to suppress, we are limited by the four corners of O'Brien's affidavits, giving almost total deference to the historical facts found by the trial court and reviewing de novo the trial court's application of the law. *See State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011).

O'Brien testified at the hearing on Rodriguez's motion to suppress that he included all facts he believed were important to procure the warrants. Regarding Wingfield and Henderson, O'Brien identically stated in both affidavits that they saw a Hispanic woman allow an unknown man into Brown's house the night of September 5:

---

[10]As the State points out, the record does not reflect that Henderson was asked to view a photo array in an attempt to identify Rodriguez. Only Wingfield and Moultry viewed a photo array and both chose the same "filler" photo.

17

I spoke with Tommy Brown's neighbor, Willy Wingfield, who said that on Thursday evening at approximately 2130 hrs–2200 hrs he observed a heavy set Hispanic female, that has hung out with Tommy Brown before, and an unknown male, walk into Tommy Brown's house when Tommy wasn't there. Willy Wingfield said it look weird because the lights were off when they went inside. Willy Wingfield said that a few minutes later he saw Tommy pull up in his truck and when Tommy got to the front door, he observed someone pull Tommy inside the house. Willy said that the lights went on for a second and then immediately back off. Willy Wingfield said that he has not seen Tommy Brown since that happened and noticed that the next morning at approximately 0630 hrs, Tommy's truck was gone. Willy Wingfield said that he has only seen two different Hispanic females at Tommy's house and he knows that one of them is Conception "Connie" Moreno and the other one is the girl who walked into Tommy's house with the unknown male, but he doesn't know her name. Willy stated that he is positive the Hispanic female who appeared to ambush Tommy with an unknown male was not Conception Moreno.

. . . I spoke with Tommy Brown's other neighbor, Billy Henderson, who said that on Thursday evening he observed a tall black male with braids, walk into Tommy Browns house with Tommy Browns Hispanic girlfriend, while Tommy Brown was gone. Billy Henderson said that he observed Tommy Brown drive up after that and go inside and never saw anyone come back out.

In the trial court, Rodriguez argued that O'Brien made a material omission in the affidavits because he did not reveal that Wingfield and Moultry picked a filler photo from the array and not Rodriguez's photo. She did not argue that O'Brien made material misrepresentations in the affidavits. To show error in the trial court's denial of her motion to suppress, Rodriguez must have raised in the trial court the same legal theory supporting suppression that she raises on appeal. *See* Tex. R. App. P. 33.1(a)(1); *Skinner v. State*, No. 01-14-00748-CR, 2016 WL 2953954, at *4 (Tex. App.—Houston [1st Dist.] May 19, 2016, no pet.)

18

(mem. op., not designated for publication); *Crouse v. State*, 441 S.W.3d 508, 516–17 (Tex. App.—Dallas 2014, no pet.); *Wright v. State*, 401 S.W.3d 813, 821–22 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). Rodriguez's trial material-omission theory does not comport with her appellate material-misstatement theory; thus, she has failed to preserve this argument for our review. *See Skinner*, 2016 WL 2953954, at *5–6. We overrule points three and four on this basis.

But even if preserved, Rodriguez's arguments are without merit. First, at no point did the affidavits misstate that Wingfield and Henderson positively identified Rodriguez as the woman they saw. *See Franks v. Delaware*, 438 U.S. 154, 171–72 (1978) (discussing requirements to attack probable-cause affidavit supporting warrant, including "deliberate falsity or reckless disregard"). O'Brien included the facts that Wingfield only saw a large, Hispanic woman who was not Moreno and that Henderson only saw Brown's "Hispanic girlfriend." To render a warrant void, misstatements in a supporting affidavit must be material and made knowingly and intentionally or with reckless disregard. *See id.* at 155–56. O'Brien's recounting of what Wingfield and Henderson saw was not an intentional or reckless misstatement. Rodriguez seems to recognize as much by arguing that the affidavits created a mere "implication" that Rodriguez was the woman Henderson and Wingfield saw. To be sure, an implication does not satisfy Rodriguez's burden to establish by a preponderance of the evidence that O'Brien made a material and false statement with the requisite mens rea in his

19

probable-cause affidavits. *See Cates v. State*, 120 S.W.3d 352, 355 (Tex. Crim. App. 2003).

Second, the absence of the fact that Wingfield did not pick Rodriguez's photo from the array does not vitiate probable cause based on the presence of other affidavit facts establishing probable cause.[11] *See Franks*, 438 U.S. at 155–56. O'Brien set out the facts he uncovered in his investigation, which we have previously recounted and all of which supported probable cause. In other words, even if O'Brien had included Wingfield's inability to identify Rodriguez from the photo array, probable cause was still found in the four corners of O'Brien's affidavits. *See Massey v. State*, 933 S.W.2d 141, 145–47 (Tex. Crim. App. 1996); *Rios v. State*, 376 S.W.3d 238, 241–44 (Tex. App.—Houston [14th Dist.] 2012, no pet.). For these reasons, the trial court did not err by denying Rodriguez's motion to suppress.

## IV. CONCLUSION

Even disregarding Fisher's and Ellis's trial testimonies, sufficient corroborating evidence and the reasonable inferences arising therefrom tended to connect Rodriguez to Brown's murder. Thus, the evidence was sufficient to support her conviction and she was not egregiously harmed by the absence of an instruction under either article 38.075 or article 38.14. Finally, the trial court did

---

[11]Again, although Rodriguez asserts on appeal that O'Brien's affidavit misstatement was that Henderson and Wingfield identified Rodriguez from the photo array, Henderson did not view an array.

not err by denying Rodriguez's motion to suppress even were we to assume Rodriguez raised her appellate suppression argument in the trial court. Accordingly, we affirm the trial court's judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL:  GABRIEL, PITTMAN, and BIRDWELL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  September 6, 2018