

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-13-00264-CR

MARIO BALLESTEROS CAMPOS, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 47th District Court
Randall County, Texas
Trial Court No. 22,949-A, Honorable Richard Dambold, Presiding

August 26, 2015

## OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Appellant Mario Ballesteros Campos appeals from his conviction by a jury of the capital murder[1] of Fred Charles Moseley and the resulting life sentence. He presents two issues. We will affirm the judgment of the trial court.

---

[1] TEX. PENAL CODE ANN. §19.03(a)(2) (West 2011).

Background

Fred Charles Moseley, seventeen, lived with his parents in Canyon, Texas. He disappeared on July 25, 1998. His parents were out of town at the time. Two days later, Moseley's Dodge Neon was found on a country road outside Canyon. Canyon police began a missing persons investigation a few days later after Moseley's parents returned home and reported their son was missing.

Moseley was not located.[2] His father died in 2004 and his mother in 2008.

Campos was indicted in 2012, by an instrument alleging that on or about July 25, 1998, in Randall County, he "did then and there, in the course of committing and attempting to commit the robbery of Fred Charles Moseley, intentionally commit murder by intentionally causing the death of an individual, to-wit: Fred Charles Moseley, by strangling him with a deadly weapon, to-wit: a cord, that in the manner of its use and intended use was capable of causing death and serious bodily injury to Fred Charles Moseley." The case was tried in July 2013.

The State's case against Campos began with the testimony of Moseley's brother who testified no one saw or heard from Moseley after his disappearance, and government records showed no earnings reported for his Social Security number.[3] He testified also that he obtained a death certificate for Moseley in 2013 for the purpose of allowing distribution of their mother's life insurance proceeds.

---

[2] After police inventoried the contents of the Dodge Neon and examined it for fingerprints, they returned it to Moseley's parents. Moseley's mother drove the car for a number of years and it was later sold. Police were unable to locate it when they searched after 2008.

[3] The brother testified the Internal Revenue Service was able to provide records for the last ten years, which would have been to 2003.

Evidence showed also that police had re-opened the investigation into Moseley's disappearance in 2008 after Aaron Savage of the Canyon police department and other officers took an interest in the cold case. They began re-interviewing Moseley's friends and acquaintances. Two of Moseley's acquaintances were Campos and Gerald Dooley, and the 1998 investigation had shown that Dooley was among the last to see Moseley.

In 1998, Campos lived in Canyon about five blocks from the Moseley residence. Dooley lived with his mother Kathy Turner in a trailer at the Willow Creek Trailer Park west of Canyon. Dooley and Campos grew up in Canyon and had been friends since childhood. In 1998, both were about 24.

During his investigation, Savage spoke with Campos in an attempt to locate Dooley, but Campos told him he had not talked with Dooley in "quite some time."

Canyon police located Dooley, who was living in Colorado. Detective Savage and a Canyon police sergeant traveled to Colorado to interview Dooley in September 2011, and made a second trip in October. Dooley eventually told them that he and Campos had killed Moseley and disposed of his body.

In his trial testimony, Dooley told the jury that on July 25, 1998, he spent the afternoon with Fred Moseley and Les Sparks. The three smoked marijuana and rode around in Moseley's vehicle.

Dooley testified Moseley dropped him off at Campos's house. There, he and Campos smoked more marijuana. They discussed a shotgun Moseley owned. Dooley

testified they decided to take the shotgun and, at Dooley's suggestion, decided to kill Moseley to do so. Dooley said he and Campos took an electrical cord from a portable radio and went to Moseley's home, where the three smoked marijuana in the backyard. As they walked toward the home's back door, Campos strangled Moseley with the cord. Dooley testified once Moseley was on the ground, he put his knee over Moseley's mouth to muffle any sound. When Moseley stopped struggling, Dooley and Campos placed his body in the trunk of Moseley's car. The two then went through the Moseley house, took the shotgun and other items, took Moseley's car and drove to Campos's house. There Campos got some clothes and they then went to Dooley's trailer, where he also got clothing.

Dooley testified when they left his trailer, they drove to Rockwell Road,[4] found a dumpster and threw away the clothes they had been wearing. The two then drove to Amarillo and put Moseley's body in a dumpster in northwest Amarillo.[5] Dooley told the jury he and Campos then drove in the night to Graham, Texas, where Dooley's grandfather and other relatives then lived but stayed only one day. After cleaning the car in Graham, the two returned to Canyon that night. Dooley said they went to his trailer and he hid the shotgun under his bed. While they were at the Willow Creek trailer, Dooley said, Campos threw some items into the dumpster. The two then drove the Neon to a dirt road south of Canyon and left it there. They walked back to Dooley's

---

[4] We take judicial notice that Rockwell Road is located south of Amarillo and north of Canyon, Texas. *See* TEX. R. EVID. 201.

[5] The State's case included the testimony of Michael Rice, the Director of Public Works for the City of Amarillo. From the City's records, Rice identified the particular area of the City's landfill into which waste was being deposited in 1998. He said that to reach the waste collected in 1998 would require excavation of some 80 to 150 feet of waste deposited on that area since then, and that the waste from an individual dumpster could have been deposited anywhere within an area some 250 feet square.

4

residence, retrieved the shotgun and buried it at a location along the railroad tracks outside Canyon.

Dooley's mother Kathy Turner testified Campos and her son were close friends. She told the jury she learned of the day-trip the two made to Graham in July 1998, and that she did not see Campos after that time until 2011, when he came to her home looking for Dooley.

Les Sparks testified he knew Moseley because they worked together at a Dairy Queen in 1998. He testified to the events of the afternoon in July 1998 when he, Moseley and Dooley spent the day drinking, smoking marijuana and riding in Moseley's Neon. Sparks said Moseley took him home in the evening, and drove away with Dooley.

Sparks told the jury that he grew bored later that night and talked with Moseley by phone, "close to midnight." Sparks "wanted to hang out" with him but Moseley "was just going to stay home and go to bed." He said that was the last time he talked with Moseley. Sparks also testified he was familiar with Moseley's shotgun, which had a pistol grip. Moseley had mentioned to him that he was interested in selling the shotgun.

Another witness, Kory Keith, said that Moseley was "probably my best friend." He said he made several attempts to contact Moseley after July 25, 1998 and could not reach him.

Toni Barler Mercer, who was Moseley's girlfriend in 1998, testified she last saw him on July 25. She said they were "supposed" to go to her cousin's house that

evening but Moseley decided to go with Dooley instead. She said Moseley's Dodge Neon was "his prized possession" and he would not have abandoned it. She further testified to his close relationship with his mother and expressed the opinion he would not have abandoned her.

Mercer also testified that at the time Dooley weighed "maybe 115, 120 pounds," and that Moseley weighed "30 to 40 pounds probably" more than Dooley, and was "a couple of inches taller." She testified Campos at the time was "probably 6' 2", 215, 220 pounds." She also said Campos was Dooley's best friend.

Barbara Anne Teltow testified that in July 1998 she and her husband managed the trailer park where Dooley and his mother lived. Their home was across the street from Teltow's trailer. Teltow said she recalled the time of Moseley's disappearance and agreed it was around that same time in July 1998 that she heard a loud noise in the early morning hours near a dumpster at the trailer park. She recalled stepping outside because of the "super loud" noise that came from the dumpster. When she looked out, "there wasn't anything in front of the dumpster. There was no one out walking around that I seen, but I had seen taillights on a car over in front of [Turner and Dooley's] house."

Later that morning, Teltow looked in the dumpster and found a spare tire, a car jack, a cassette box, a cigarette ashtray and some school supplies. Teltow said the dumpster was emptied the day before. She removed the car jack and handle from the dumpster. Teltow was not able to identify any occupant of the "fairly new looking small dark car" she saw parked next to Dooley's trailer and did not actually see anyone in the

6

car put items in the dumpster. When shown a photograph of Moseley's Dodge Neon, she agreed the car she saw was "similar."

That evening, Teltow said, she and her husband went to a local restaurant for dinner. While there, they discussed the items she found in the dumpster. Teltow told an employee of the restaurant, Jeff Schiller, what she had found. Schiller was a friend of Moseley's, and they discussed Moseley's disappearance. Schiller suggested the items from the dumpster might be connected and that police should know about them. Teltow testified she gave Schiller the car jack and handle and he later gave them to Canyon police.

Sparks testified he went with Schiller to the trailer park "a couple of days" after July 25, and they took the jack and "tire iron" to police. By that time, Sparks testified, he knew that Moseley's car had been found, and that property was reported missing from the car. On cross-examination, Sparks told the jury that the items he saw had come from Moseley's car.[6]

Testimony showed that after Dooley's confession in October 2011, officers dug for the shotgun where Dooley told them it was buried. In November, they uncovered a pistol-grip shotgun buried there. At trial, Sparks was shown a photograph of the shotgun and identified it as Moseley's. Kory Keith also agreed the shotgun in the photograph "does look like [Moseley's] shotgun."

---

[6] Asked how he knew they came from Moseley's car, Sparks said, "Either someone told us that or the police had said when they came to question us." Asked if he had ever seen a jack and "lug wrench" like those, he responded that he had seen similar ones in the trunk of another Dodge Neon. He acknowledged, though, that the items were "pretty common."

The State also presented the testimony of Amber Bates, Dooley's former girlfriend. Bates testified they were together from 2000 to 2007 and had a daughter together. After she and Dooley broke up, she and her child continued to live with his mother Turner. Bates also knew of Campos. He was a friend of her cousins and she knew he was a friend of Dooley's. During the years she was with Dooley, however, Campos and Dooley did not associate.

Bates testified to an event that occurred after she was interviewed by detective Savage. She said Savage contacted her "to talk to me about [Dooley] and the . . . Fred Moseley that was missing." "About a week" after Savage "brought me in to speak with him," Bates was at home at Turner's when Campos came to the door. She testified:

> It was Mario at the door. He asked if Gerald was there. And I said, no, that he no longer lived there. He then asked if Kathy was there, and I said no, but she should be home soon. And he tried to come in. And I asked him, please, stay on the porch. My daughter was right behind me. I asked if he would like to leave a message. And he said yes. I stepped back to get a pen and paper off the bookshelf next to the door. He tried to come in again. I told him, no, stay on the porch. He gave me his name and his number, and he left. And I immediately called Officer Savage and gave him the tag number off of the car. And he immediately told me that that was Mario Campos' mother's car.

Dooley was arrested after police uncovered the buried shotgun in November 2011. Dooley testified he and the State reached an agreement whereby the State promised to recommend a ten-year prison sentence if he pleaded guilty.

Campos also was arrested in November 2011, in Uvalde, Texas. The arresting Uvalde officer testified. He said he knew Campos by sight, and was informed that a warrant had been issued for his arrest on a charge of capital murder. He saw Campos

8

in Uvalde, stopped him for a traffic violation, and arrested him pursuant to the warrant. The officer testified that "[a]fter I placed him in my patrol unit, I was taking him to the sheriff's office, he kept asking me what was the . . . warrant for. Once I had him secured in my vehicle, I got in the front seat and I advised him it was for capital murder." Asked about Campos's reaction, the officer said, "When I saw him . . . I was looking back at him and what his reaction was after I told him, he was like just . . . his body weight just kind of dropped down. He took a breath and then asked me if I could ask the jailers to place him in a cell by himself." He later testified that after he told Campos he would tell the jailers, "he said he had a lot of things to think about."

Campos did not testify at trial and presented his case entirely through cross-examination of the State's witnesses. After the jury rendered its verdict, the trial court assessed punishment against Campos at imprisonment for life.

## Analysis

By his two issues on appeal, Campos contends Dooley's accomplice witness testimony was not corroborated and the evidence was insufficient to show he committed the offense of capital murder.

As noted, the indictment here alleged that Campos intentionally murdered Moseley, intentionally causing his death in the course of committing and attempting to commit robbery of Moseley, by strangling him with a deadly weapon, a cord, that in the manner of its use and intended use was capable of causing death and serious bodily injury.

9

A person commits the offense of capital murder if he commits murder and intentionally commits the murder in the course of committing or attempting to commit, among other crimes, robbery. TEX. PENAL CODE ANN. §§ 19.02(b)(1); 19.03(a)(2) (West 2011). Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State,* 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal,* 286 S.W.3d at 327; *see Malik,* 953 S.W.2d at 240.

In evaluating the sufficiency of the evidence supporting a conviction, our inquiry is "whether, after viewing the evidence in a light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Garcia v. State,* 367 S.W.3d 683, 686-87 (Tex. Crim. App. 2012) (*citing Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). It is the role of the trier of fact to resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from that evidence. *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (*citing Jackson*, 443 U.S. at 318-19). The trier of fact is the sole judge of the credibility of witnesses and the weight, if any, to be given to their testimony. *Brooks v. State,* 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.). The State may prove the elements of an offense by either direct or circumstantial evidence. *Hooper,* 214 S.W.3d at 13. In a sufficiency review "circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial

10

evidence alone can be sufficient to establish guilt." *Id.* If the record could support conflicting inferences, we presume that the fact finder resolved the conflict in favor of the prosecution and defer to that resolution. *Garcia,* 367 S.W.3d at 687.

When, as in this case, the jury's verdict could have been based on the testimony of an accomplice, the sufficiency review must incorporate the accomplice witness rule stated in article 38.14 of the Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2013). Article 38.14 "provides that a conviction cannot stand on accomplice testimony unless there is other evidence tending to connect the defendant to the offense. The corroborating evidence under 38.14 need not be sufficient, standing alone, to prove beyond a reasonable doubt that a defendant committed the offense. *Joubert v. State,* 235 S.W.3d 729, 731 (Tex. Crim. App. 2007) (internal footnotes omitted). Thus, it is not required that non-accomplice evidence corroborate the proof of the aggravating elements of a capital murder even if those elements are proven by an accomplice's testimony. *Camacho v. State*, 864 S.W.2d 524, 535 (Tex. Crim. App. 1993); *see* George E. Dix & John M. Schmolesky, 43A TEXAS PRACTICE: CRIMINAL PRACTICE & PROCEDURE § 51:98 at 810 (3rd ed. 2011). There is no set amount of non-accomplice corroboration evidence that is required for sufficiency purposes; each case must be judged on its own facts. *Malone v. State,* 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). The non-accomplice evidence "must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this

evidence sufficiently tended to connect the accused to the offense."[7] *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009) (internal quotation omitted).

Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999). Evidence that the defendant was in the company of the accomplice near the time or place of the offense is proper corroborating evidence. *McDuff v. State,* 939 S.W.2d 607, 613 (Tex. Crim. App. 1997). If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, then the requirement of article 38.14 has been fulfilled. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999).

The appellate court views the corroborating evidence in the light most favorable to the jury's verdict. *Gill v. State,* 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). "[W]hen there are two permissible views of the evidence (one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense), appellate courts should defer to that view of the evidence chosen by the fact-finder." *Simmons*, 282 S.W.3d at 508-09; *see* George E. Dix & John M. Schmolesky, 43A TEXAS PRACTICE: CRIMINAL PRACTICE & PROCEDURE § 51:98 at 811, *citing Bledsoe v. State,* 21 S.W.3d 615, 620 (Tex. App.—Tyler 2000, no pet.).

The jury charge included the following accomplice witness instruction:

---

[7] "The appellant's liability as a principal or under a parties theory is of no relevance under an Article 38.14 analysis. The question is whether some evidence 'tends to connect' him to the crime; the connection need not establish the exact nature of his involvement (as a principal or party)." *Joubert,* 235 S.W.3d at 731.

You are charged that GERALD ROSS DOOLEY is an accomplice if any offense was committed, and you are instructed that you cannot find the defendant guilty upon the testimony of GERALD ROSS DOOLEY unless you first believe that the testimony of the said GERALD ROSS DOOLEY is true and that it shows the defendant is guilty as charged in the indictment; and even then you cannot convict the defendant, MARIO BALLESTEROS CAMPOS, unless you further believe that there is other evidence in this case, outside the evidence of the said GERALD ROSS DOOLEY, tending to connect the defendant with the commission of the offense charged in the indictment and then from all the evidence you must believe beyond a reasonable doubt that the defendant is guilty.

The non-accomplice evidence tending to connect Campos with Moseley's murder begins with the facts that Moseley, his Dodge Neon and his shotgun all were missing from the Moseley home when his parents returned. Within "a couple of days" after July 25, Sparks and Schiller retrieved the car jack and tire iron that, Sparks testified, came from Moseley's Neon, after Teltow found them in the trailer park dumpster. Teltow testified that the "super-loud" noise she heard during the early morning hours "was a real heavy sound like some kind of heavy metal or something had been thrown into an empty dumpster." A rational juror who accepted these non-accomplice witnesses' testimony readily could infer that it was Moseley's Neon that Teltow saw parked next to Dooley's residence when she heard the loud noise and that the items she found in the dumpster came from the Neon. Dooley, years later, lead police to the location of Moseley's shotgun, buried outside town. All of this evidence, wholly aside from his confession, strongly associates Dooley with Moseley's disappearance. And Turner's testimony confirming Campos accompanied her son on the visit he made to Graham places Campos in Dooley's company near the time of Moseley's disappearance. *See McDuff,* 939 S.W.2d at 614.

13

To this we add the circumstance that "about a week" after Amber Bates visited with detective Savage about Moseley's disappearance, Campos appeared at Turner's home, asking about Dooley. This, after ten years of no contact from his former best friend Campos, who was living in Amarillo when Savage re-interviewed him. We agree with the State that Campos's effort to locate Dooley at that particular time could be coincidental, merely an attempt to renew a too-long-dormant friendship. But we agree with the State also that a rational juror could see it as a more suspicious circumstance, not coincidental at all but related to the now-active investigation into Moseley's disappearance. That the visit led Bates to contact Savage immediately suggests that she viewed it with suspicion. There being two permissible views of Campos's actions, we must defer to the view that supports the jury's verdict. *Simmons*, 282 S.W.3d at 508-09 (holding jury rationally could find defendant's letter was innocent person's expression of frustration for having been implicated in offense, but rationally also could find letter was a threat).

Turner's testimony that she did not see her son's former best friend after their trip to Graham in 1998, until he came to her home in 2011 carries a similar significance. Like Campos's earlier visit with Bates, it coincided with a period of activity in the re-opened investigation. And, like the visit with Bates, it need not be seen as coincidental but may rightly be viewed as suspicious.

The State argues that Campos's demeanor at the time of his arrest in Uvalde was indicative of a consciousness of guilt. In particular, the State relies on Campos's active questioning of the officer concerning the subject of the warrant and his failure to ask further questions after being told it was for capital murder. Even viewed in the light

14

most favorable to the verdict, we do not see Campos's behavior as strongly suggesting a consciousness of guilt.  But we will not say a juror would be irrational to give it some weight in that regard. *See Lewis-Grant v. State,* No. 14-09-00068-CR, 2010 Tex. App. LEXIS 7100 (Tex. App.—Houston [14th] Dist. Aug. 31, 2010, pet. ref'd) (mem. op., not designated for publication) (demeanor during interview with police considered as a "suspicious circumstance" in analyzing corroborating evidence); *Castaneda v. State,* No. 14-05-01151-CR, 2007 Tex. App. LEXIS 3173, at *17  (Tex. App.—Houston [14th Dist.] Apr. 26, 2007, pet. ref'd) (mem. op., not designated for publication) (court considered appellant's demeanor during a police interview after his child was critically injured as a "suspicious circumstance"; appellant "showed no emotion the entire interview [as] we talked to him. He was very calm, still. . . . [H]e wasn't excited, no body movement, no hand gestures. He sat there, stared coldly into my face, answered the questions and gave the explanations . . .). *Cf. Salinas v. State,* __ U.S. __, 133 S. Ct. 2174, 186 L. Ed. 2d 376 (discussion of defendant's silence when speaking with police).

Viewing all the suspicious circumstances together, in the light most favorable to the verdict, we find the non-accomplice evidence here sufficient. The corroborating evidence is not strong, and does not directly connect Campos with Moseley's murder, but a rational juror could find it tends to connect him. *Simmons*, 282 S.W.3d at 511. We overrule Campos's first issue.

Campos's second issue challenges the sufficiency of the evidence to prove Moseley's murder.  He contends the evidence was insufficient to support his conviction because Moseley's body was never recovered, and because the evidence did not show

the existence of a cord, that a cord was used to kill Moseley or that there was a struggle among Moseley, Dooley and Campos.

We think two settled principles answer appellant's evidentiary sufficiency issue. First, the law is settled that, once corroborated, testimony of an accomplice may be considered by the jury in the same manner as any other competent evidence. *See Herron v. State,* 86 S.W.3d 621, 632 (Tex. Crim. App. 2002) (once it is determined that corroborating non-accomplice evidence exists, the purpose of the instruction is fulfilled, and the instruction plays no further role in the factfinder's decision-making). The jury was free to accept Dooley's testimony, and his testimony, if believed, established all the elements of the offense.

Second, the State's inability to produce or identify the victim's body or remains does not preclude a murder conviction. *McDuff,* 939 S.W.2d at 614; *Fisher v. State,* 851 S.W.2d 298, 303 (Tex. Crim. App. 1993). Appellant is correct that the State's case included no bodily remains or other physical evidence of Moseley's murder. But Dooley's in-court testimony, particularly when coupled with the substantial circumstantial evidence of Moseley's death, provided the required proof.[8] *See*

---

[8] The parties do not address, and we do not find it necessary to discuss, the place Dooley's out-of-court statements might have in the evidentiary sufficiency analysis. During their testimony, detective Savage and sergeant Coggins of the Canyon police recited in some detail statements made to them by Dooley during their interviews in Colorado. The statements thoroughly implicate Campos as well. Campos raised a hearsay objection to Savage's testimony. The State responded that Dooley's statements were against his penal interest. The court overruled the hearsay objection, and the ruling is not challenged on appeal. No objection was raised to Coggins' similar testimony. The out-of-court statements of an accomplice may not be used to corroborate his testimony for purposes of article 38.14. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). But, an out-of-court statement does not itself require corroboration under article 38.14, *Bingham v. State,* 913 S.W.2d 208 (Tex. Crim. App. 1995), and the jury may consider it as independent evidence of guilt "as long as it was corroborated as required by Tex. R. Evid. 803(24)." *Archie v. State,* 340 S.W.3d 734, 737 n.3 (Tex. Crim. App. 2011) (*citing Bingham v. State,* 987 S.W.2d 54 (Tex. 1999)).

*Carrizales v. State,* 414 S.W.3d 737, 744 (Tex. Crim. App. 2013) (clarifying that when a case does not involve a defendant's extrajudicial confession, "there is neither need nor purpose to refer to the *corpus-delicti* doctrine"); *McDuff*, 939 S.W.2d at 614 (discussing application of *corpus delicti* requirement).

We overrule Campos's second issue. Having resolved against him both the issues Campos has raised, we affirm the judgment of the trial court.

James T. Campbell
Justice

Publish.