

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-24-00235-CR
_____


FELISHA LYNN SCROGGINS, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 30812


Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

In late 2023, Felisha Lynn Scroggins and another individual were found to be housing Scroggins's nine-year-old daughter, Alice,[1] in a van in a parking lot. The three had been living in the van for about seven years. Scroggins was indicted, and a Lamar County jury convicted her of reckless injury to a child by act or omission, a second-degree felony, and assessed her punishment at twenty years' incarceration. *See* TEX. PENAL CODE ANN. § 22.04 (Supp.). Scroggins claims the evidence was insufficient to prove that she recklessly committed any act or omission and was insufficient to prove Alice suffered a serious bodily injury. There was, however, testimony that years of insufficient nutrition had caused Alice's growth to be stunted to the point that her size was that of a child four or five years younger than her actual age. When removed from Scroggins, Alice, who had never been to school, did not have the strength to walk from a classroom to a school cafeteria. While Alice's mobility improved, there was testimony that she would suffer lasting physical and cognitive deficits compared to children of her chronological age. In other words, there was testimony sufficient to support a finding that Alice had suffered "bodily injury" due to years of malnutrition. There was also testimony from which the jury could conclude that Scroggins recklessly did that to Alice, whether by the acts of deliberate choices of withholding appropriate nutrition or the years-long omission of appropriate nutrition that, as a parent, Scroggins had the duty to provide. *See* TEX. FAM. CODE ANN. § 151.001(a)(3) (Supp.). Because we find the evidence was sufficient to support Scroggins's conviction, we affirm.

---

[1]We use a pseudonym to protect the identity of Scroggins's daughter, who was a minor at the time of the offense. *See* TEX. R. APP. P. 9.10.

## I.  Standard of Review and Applicable Law

"The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence." *Braughton v. State*, 569 S.W.3d 592, 607 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979)).  "We assess legal sufficiency by viewing the evidence in the light most favorable to the verdict and asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Bittick v. State*, 707 S.W.3d 366, 368 (Tex. Crim. App. 2024) (citing *Jackson*, 443 U.S. at 319).  "We compare the trial evidence to 'the elements of the offense as defined by a hypothetically correct jury charge for the case.'"  *Id.* at 369 (quoting *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018)).

"This familiar standard 'recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence.'" *Braughton*, 569 S.W.3d at 608 (quoting *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)).  "On review, this Court determines whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of the evidence."  *Id.* (quoting *Adames*, 353 S.W.3d at 860).  "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution."  *Id.*  "As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder."  *Id.*  "A reviewing court is thus 'required to defer to the jury's credibility and weight determinations.'"  *Id.* (quoting *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010)).  "However, juries are not permitted to come to conclusions based on 'mere

3

speculation or factually unsupported inferences or presumptions.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007)).

"In reviewing the sufficiency of the evidence, we should look at '"events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act."'" *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021) (quoting *Hooper*, 214 S.W.3d at 13). "Each fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020) (citing *Hooper*, 214 S.W.3d at 13). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015). Further, we "consider all of the admitted evidence, regardless of whether it was properly admitted." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson*, 443 U.S. at 319).

"To sustain a conviction for reckless injury to a child the evidence must prove that a defendant recklessly, by act or omission, caused serious bodily injury to a child."[2] *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citing TEX. PENAL CODE ANN. § 22.04(a)(1)). In the context of injury to a child by omission, "the State's burden [is] to show

---

[2]Scroggins was indicted under Section 22.04(a)(1) of the Texas Penal Code: "FELISHA LYNN SCROGGINS, a parent of [Alice], . . . did then and there, by act or omission, intentionally and knowingly cause serious bodily injury to [Alice], a child 14 years of age or younger, by failing to provide adequate food or medical care." *See* TEX. PENAL CODE ANN. § 22.04(a)(1).

4

that Appellant had a statutory duty to act, [s]he failed to act, and in failing to act, [s]he either: (1) intended serious bodily injury to be caused, or (2) knew serious bodily injury would be caused, but [s]he still failed to act." *Cockrell v. State*, 721 S.W.3d 448, 454 (Tex. Crim. App. 2025). "A parent of a child has . . . the duty to support the child, including providing the child with clothing, food, shelter, medical and dental care, and education." TEX. FAM. CODE ANN. § 151.001(a)(3).

## II. The Evidence at Trial

Scroggins and Alice began living with Ramon Alvarez when Alice was three years old. Scroggins said she had been "trying to find the Lord," and when she saw Alvarez holding a cross on the side of the road, with "Jesus" on his van, she thought the Lord was giving her a message that "it was time to go." Scroggins testified that she and Alice then moved into the van with Alvarez, and they traveled with Alvarez. They lived off donations Alvarez received as he preached the gospel. Throughout her testimony, Scroggins ascribed their comings and goings to divine directives given to Alvarez.[3]

Scroggins testified that a typical day in the van began with Alvarez getting up at 8:00 a.m., and she and Alice would get up at 9:00 a.m. They would get up, do prayers, Alice would brush her teeth, and then they would go to a gas station to get gas, fill jugs, and dump waste. Then they would set up somewhere where Alvarez would preach while Scroggins and

---

[3]The following exchange between Scroggins's counsel and Scroggins is illustrative:

> Q: . . . [W]ho decided when to leave and where to go?
> A: [Alvarez] did.
> Q: And how did he know where to go or --
> A. He would go and pray and then we'd just take off and the Lord would put us wherever he wanted us.

Alice stayed in the van. They would have lunch and later close up at 4:00 p.m. They would then go to a gas station again to get gas for the generator, fill jugs, and go to the bathroom. Alice would have dinner at 6:00 p.m. Then they would settle down for the night, typically staying overnight at a gas station or a truck stop.

Scroggins said all three of them used the restroom most of the time at a gas station. In the winter, they would shower at a truck stop or a KOA campground, but in the summer, churches would allow them to use their faucets, and they would shower under a tarp at the back of the van. Scroggins also testified that she would heat water that they would use to wash, and she also always had wipes. Scroggins admitted, though, that when the police raided their van at 8:00 a.m. one morning, there were two makeshift toilets in the van. Scroggins said one was Alvarez's, while she and Alice used the other. Scroggins said they would dump them every morning when they got up, but she was not able to dump them the morning that the police came at 8:00 a.m. Scroggins said they only used those toilets during the night or if they were set up somewhere where there was no restroom.

When shown a photograph of the inside of the van, Scroggins described the entry area of the van, where there was a small couch for Alvarez. Scroggins said the area in front of the couch, between the front seats of the van and the bed set up in the back, was "the area where [they] would stand and [she would] cook right there and [Alice would] play."

Scroggins and Alvarez shared a bed in the van, and Alice had her own sleeping area. Scroggins described Alice's bed as stretching "the entire length of the back of the van," and she said "[t]here was plenty of room under there." Scroggins said that she and Alvarez were going to

make bunk beds back there and that Alice's bed was the bottom layer of that. Scroggins stated, "We just hadn't got to the bunkbeds yet."

Scroggins testified that Alice only got sick one time during the seven years they lived in the van. Alice had been playing with some other children, and she contracted a stomach virus. Scroggins treated Alice with half of a Tylenol, a lot of water, and prayer and said that Alice was well the next day. Scroggins said she never took Alice to the doctor, but she would have if she had seen a problem.

Scroggins testified that Alice ate three times a day and had a snack. Alvarez did the grocery shopping, and Scroggins sometimes told him what to get. When asked whether Alvarez ever bought protein for Alice, Scroggins said, "I guess the most you get protein from is milk and it was hard for us to keep milk. We kept powdered milk."

Scroggins testified that they had a cooler in the back of the van where Scroggins kept all her food, such as rice, butter, and seasonings. She also had a backpack in which she kept instant foods like mashed potatoes and noodles. Scroggins said she would cook hot meals on a propane burner they had. Scroggins said on a typical day, Alice would have peanut butter and jelly for lunch, and she and Alvarez would have a chicken sandwich. Alice would have ramen noodles for dinner, while Scroggins would cook a bigger meal for Alvarez and Alice would get corn or mashed potatoes on the side.

Scroggins denied that she "knowingly or intentionally tr[ied] to cause bodily injury to [Alice]." Scroggins said that if she believed she had been harming Alice, they "would have left." Scroggins said she thought Alice "was doing okay in the van."

7

In December 2023, the van broke down at a Home Depot.  On January 29, 2024, a local couple, the Bramletts, offered mechanical assistance.  Soon thereafter, Alvarez agreed to have the van towed to the Bramletts' home.  At that point, the Bramletts discovered that Alice was in the van.

Scroggins testified that Alvarez had decided that they would not introduce Alice to complete strangers.  They did not introduce Alice to people they did not know until they knew them better.  On the evening the van was towed, Alice played outside with another child at the Bramletts' home.

On cross-examination, Scroggins admitted she knew that "a mother's first instinct is to feed that child," "you feed a baby and the baby grows," and if "[y]ou don't feed the baby . . . the baby doesn't grow."  Scroggins said she saw that Alice was small, but she said Alice was born prematurely and her first child was also tiny.

Scroggins testified that she thought dry cereal alone was a good, healthy breakfast for a child.  Scroggins admitted that Alice would get peanut butter and jelly for lunch while she and Alvarez would have a chicken sandwich, can of chicken, or a dollar burger.  Alice would have ramen noodles for dinner if she did not have what they were having or if they did not give her pizza or spaghetti.  Scroggins said it was not necessarily true that when she and Alvarez had pork chops or hamburgers, they would not give any to Alice.

Scroggins testified that she let Alice play outside at a park two or three times a week.

Jennifer Bramlett testified that they became aware that Alvarez's van was "broken down in the Home Depot parking lot."  She and her husband did charity work, and they went to help

8

Alvarez and Scroggins with the van.  Bramlett and her husband went to the parking lot to check on the van, but Alvarez initially refused to allow the van to be towed.  About two weeks later, on January 29, 2024, the Bramletts checked again, and due to needed repairs, Alvarez allowed the van to be towed to the Bramletts' home.  Bramlett did not see Alice until after the van got to her house.  Bramlett offered all of them use of her restroom, food, and a place to sleep, but Alvarez was making the decisions, and Scroggins "simply said she was fine."

When Bramlett saw Alice, she believed that Alice was about five or six years old.  Alice was "very small and very pale and not very verbal."  Scroggins would not speak to Bramlett, and Scroggins would not allow Alice to speak or laugh—if she did, "she got shushed."  At first, Scroggins would not allow Alice to play with the Bramletts' daughter, but the Bramletts' daughter later brought out coloring books, and Alice colored with her daughter "under the watchful eye of [Scroggins] and [Alvarez]."

Bramlett made a report, and law enforcement came to their house around 7:00 p.m. that same evening.  Alvarez and Scroggins refused to exit the vehicle or produce Alice.  After some time, law enforcement left.  They came back the next morning.

Anita Dake, an investigator with Texas Department of Child Protective Services (CPS),[4] was with law enforcement when they responded to the Bramletts' home on the evening of January 29.  Alvarez and Scroggins were in the van and indicated they did not want to speak with Dake.  Scroggins told Dake there was a child in the van, but Scroggins said the child was asleep and she would not wake her up.

---

[4]This is the terminology used by the witness.

Dake returned the next morning. Alvarez still would not speak to her, but Scroggins gave Dake some information and allowed her to see Alice. Dake recounted the details of the living conditions in the van consistent with Scroggins's testimony. Dake said she did not get into the van "because it was so cluttered." Dake noticed the electrical cords from their heater. Dake said she "couldn't even imagine where the child was sleeping." Dake saw the portable toilet Scroggins had called Alvarez's toilet, and it had feces and urine in it.

Dake spoke with Alice, then CPS decided to remove Alice from her mother. Alice was taken for an interview at the Children's Advocacy Center of Paris. Alice did not want to be interviewed, and Dake said Alice seemed overwhelmed and was running around the room trying to burn off some energy.

Melani Reese, a pediatric nurse practitioner, examined Alice on February 5, 2024. Reese testified that Alice's placement caregiver informed her that Alice had been living in a van in a parking lot with no running water, had not been in school, and had not been getting regular checkups. Reese said Alice, who had recently turned ten years old, was "below the first percentile" for height and weight on growth charts.

Reese testified that Alice's laboratory work was "surprisingly very good" although "[s]he was very low in vitamin D, which is necessary for bone growth." Reese testified that Alice "complained of always being cold" and "that her legs would hurt when she would try to play." Reese stated that Alice's foster mother said Alice "would try to play and always complained that she couldn't keep up and she was tired." Reese testified that if Alice "wasn't active and confined in the vehicle and not allowed to go outside and play she would have weak muscles, activity

10

intolerance." Reese said Alice's coldness could "be a symptom of malnutrition or thyroid issues," which "would warrant more investigation." Though Reese noted in her exam of Alice that she was well developed, Reese stated that notation was unrelated to nourishment but instead signified a lack of deformities. Reese testified that Alice was "very small for her age, [although her] height and weight [were] proportionate." Alice's body mass index put her in the twelfth percentile even though she was small—"anything below the 5th percentile of pediatrics for body mass is considered underweight."

Reese testified that "based on her history and her physical exam [she] was highly suspicious for malnutrition," so Reese ordered a "full spectrum" of tests. Reese said Alice was three feet, eight inches tall and weighed forty pounds at ten years old. Reese said some symptoms of malnutrition include "poor growth, poor dietician [sic], dry skin, dry hair, cold intolerance" and "[m]uscle aches." Reese said Alice exhibited "[c]old intolerance, muscle weakness, muscle pain, dry skin," and "poor growth." Alice did not exhibit a bloated stomach, swollen feet, diarrhea, vomiting, or runny nose, which can also be signs of malnutrition.

Reese testified that poor growth is a symptom of malnutrition. She further testified that Alice's growth was stunted—that is, her growth was "not occurring as it should be." Reese said Alice was not the size of a normal ten-year-old but was closer to a four- or five-year-old. Reese said children and infants develop and grow quickly and "need a lot of nutrition in order to achieve their normal height and weight"; if they do not receive that nutrition, they will probably always lag behind and be "smaller than they would've been if they had proper nutrition." Reese testified that when a child does not receive the nutrition they need, they are "[n]ot usually" able

11

to make up that height later on. Reese agreed that malnutrition can "cause permanent impairment or degradation of what [a malnourished child] would otherwise be," "not only for growth but for cognitive delays too." Reese said malnutrition can result in behavioral problems such as inattention, learning disabilities, and information retention difficulties.

Reese's diagnosis of severe protein calorie malnutrition was not confirmed via the laboratory tests. Alice's albumin protein levels were normal. Reese testified that malnutrition and stunted growth do not occur over a short timeframe, but they take months to develop. Reese agreed that someone's laboratory tests could come back as normal and that person still be malnourished. Reese stated that her working diagnosis, based on her history and her growth, was that Alice's illness was severe, and it would have been prudent to hospitalize Alice if her illness were severe, but Reese did not hospitalize her.

Reese testified that Alice's thyroid tests came back normal, ruling out a glandular problem as a cause of Alice's height. Reese testified to her initial findings upon her examination of Alice, which included: well developed; normal weight; very small for her age; normal head, ears, nose, and throat; normal cardiovascular and pulmonary; no pain or stiffness in her neck with movement; small skin-colored papules that could have been a rash or dry skin; alert and oriented mental status; and normal mood and affect. Alice's laboratory results showed normal blood cells, no anemia, good kidney and liver function, slightly elevated blood sugar that may have been from recently eating or drinking, normal protein and albumin, prealbumin "just a hair low," and low vitamin D levels. Reese testified that Alice was "better nursed than [she] expected

her to be given her circumstances" and said she "definitely need[ed] sunshine" and sources of vitamin D. Reese testified powdered milk is not usually a source of vitamin D.

Alice testified that she lived in a van with her "mom and someone else" before she lived where she was living at the time of trial. She said when she lived in the van, she ate Honey Nut Cheerios for breakfast and nothing else—no milk or fruit—just Honey Nut Cheerios. For lunch she would have a peanut butter and jelly sandwich, sometimes with grape jelly, sometimes strawberry. For dinner she had ramen noodles with nothing else. Alice testified that she did not ever have vegetables, and she had fruit "[e]very once in a while." Alice said her mom would give her a snack if she had one, like a piece of a granola bar. Alice testified that her mother got to eat "[p]ractically anything she wanted" and that she "many times" wanted to eat what her mother had, like hamburgers and pork chops, but she only got to have ramen noodles.

Alice testified that she played with Legos, coloring books, and boxes she made into toy houses and would pretend to cook. Alice said she did not get to play outside or on a playground or monkey bars. Alice said when she left the van and started school, she liked recess—the "[m]onkey bars, slides, friends, [and] fresh air"—and she would get sweaty and hot. Alice said when she began school her legs would "kind of" hurt, but she got over it. She did not remember anyone ever having to help her get to class. Alice said she just ignored the pain, and it went away in "maybe an hour."

Alice testified that the day before she was removed, she was playing with another little girl, running around the yard and collecting things. Alice said she colored a little bit.

13

Catherine Barnett, Alice's foster mother after the removal, testified that Alice was "very, very small and fragile" when she was placed with them—"[s]he was in bad condition." Alice initially had to be carried, because "she couldn't walk very far." Barnett testified, "[W]e had to carry her or the teacher had to carry her back and forth to the gym or to the lunchroom because she had no muscle strength to walk anywhere. Even to the doctor's office I had to carry her because she didn't have the muscle strength." Barnett said Alice had to be carried for about a month. Alice had to have occupational therapy and physical therapy to build up the strength to walk.

Barnett said Alice always asked permission before eating because she had previously only been allowed to eat if she had permission. Barnett said Alice would get food from the pantry "and hide it because she was very concerned there wouldn't be food there the next day." Barnett testified that the doctor put Alice on PediaSure three times a day in addition to regular food because she was so malnourished.

Barnett testified that Alice also had problems with her vision. The first day Alice was at Barnett's house, she ran into the door. She also ran into the countertop because she could not see well. Barnett said her child wanted to throw the ball with Alice, but Alice could not catch it because she could not see it. Barnett said Alice was given glasses for her vision problem, but she needed eye surgery.

Barnett said Alice initially had occupational and physical therapy twice a week, but Alice progressed so quickly that soon she only had to go once a week. In therapy, Alice did things like

learning how to pedal a bike, a lot of walking, running, and building the strength to walk up stairs.

Barnett said Alice's teacher had to carry Alice to the cafeteria and to physical education (PE), and Alice did not have to participate in certain PE activities because there were concerns about Alice being injured since her peers were so much bigger than her. Alice's behaviors were also delayed—she preferred playing with toddler toys, she did not know how to socialize. More basically, Alice could not read and write.

David Whitaker, a detective with the Paris Police Department, testified that he was on the scene when Alice was removed. Whitaker testified that Scroggins gave a false name and would not provide "normal, everyday information" that someone would when the police were "checking on the welfare of your child." He said Scroggins's behavior was "evasive" and "out of the norm."

Whitaker said Alice could not spell her first name, did not know her last name, and did not know her birth date. Whitaker testified that what concerned him more than anything was finding out that Alice was ten years old, as he had thought she might be six or seven.

Whitaker said the makeshift toilet inside the van was "emitting a very foul odor." He said the van was so packed and had very little room in which Alice could even stand up, "much less be in that van with" Scroggins and Alvarez. Whitaker said Alice's sleeping space was the area over the right rear tire, under a shelf, "maybe 12 inches above the floor and maybe four feet long"—"Very small. Very, very small." Whitaker said Alice's sleeping area was "literally right there" around the corner, reaching distance from the foul-smelling makeshift toilet.

15

**III. Legally Sufficient Evidence Supports Scroggins's Conviction**

**A. Mental State**

In her first issue on appeal, Scroggins argues the evidence at trial was insufficient to establish that she recklessly committed any act or omission.

"Injury-to-a-child offenses under [Section] 22.04 are 'result-oriented' and 'requir[e] a mental state that relates not to the specific conduct but to the result of that conduct.'" *Cyr v. State*, 665 S.W.3d 551, 556 (Tex. Crim. App. 2022) (second alteration in original) (quoting *Williams*, 235 S.W.3d at 750). "The State must prove that a defendant caused a child's serious bodily injury with the requisite criminal intent." *Williams*, 235 S.W.3d at 750.

> A person acts recklessly, or is reckless, with respect to . . . the result of [her] conduct when [s]he is aware of but consciously disregards a substantial and unjustifiable risk that the . . . result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE ANN. § 6.03(c).

> [I]n addressing the culpable mental state of recklessness under section 6.03(c), the factfinder (and a reviewing court) must examine the defendant's conduct to determine whether
>
> > (1) the alleged act or omission, viewed objectively at the time of its commission, created a "substantial and unjustifiable" risk of the type of harm that occurred;
> >
> > (2) that risk was of such a magnitude that disregard of it constituted a gross deviation from the standard of care that a reasonable person would have exercised in the same situation (i.e., it involved an "extreme degree of risk, considering the probability and magnitude of the potential harm to others"),

16

(3) the defendant was consciously aware of that "substantial and unjustifiable" risk at the time of the conduct; and

(4) the defendant consciously disregarded that risk.

*Williams*, 235 S.W.3d at 755–56 (footnote omitted) (citations omitted); *see Adams v. State*, No. 06-13-00016-CR, 2013 WL 4858774, at *4 (Tex. App.—Texarkana Sept. 11, 2013, pet. ref'd) (mem. op., not designated for publication). "'Mere lack of foresight, stupidity, irresponsibility, thoughtlessness, ordinary carelessness, however serious the consequences' . . . do not suffice to constitute . . . criminal recklessness." *Williams*, 235 S.W.3d at 751 (quoting *People v. Carlson*, 26 N.Y.S.2d 1003, 1005 (N.Y. Cnty. Ct. 1941)).

Scroggins was indicted for intentionally and knowingly committing an act or omission that caused serious bodily injury to Alice by failing to provide adequate food or medical care. The jury convicted her of the lesser included offense of recklessly causing serious bodily injury to Alice. The evidence at trial indicates that the only protein Scroggins routinely fed Alice was peanut butter. Scroggins routinely fed Alice a diet that consisted of dry Honey Nut Cheerios, peanut butter and jelly sandwiches, and ramen noodles. Scroggins argues on appeal that those are "staples of the diet of picky children nationwide," but she cites no evidence that Alice was a picky eater. In fact, Alice testified that she often wanted what her mother was eating. Yet, testimony indicates that Alice could only eat when she was given permission.

Scroggins testified that she would prepare meals for Alvarez that included pork chops or chicken, but from that larger meal, she would only provide Alice the side dishes like corn or mashed potatoes. Scroggins knew milk could be a source of protein, but she stated they were unable to keep milk in the van, even though they had a cooler where she kept butter. In addition,

17

even though Alvarez regularly went to the grocery store, Scroggins only occasionally asked him to get anything in particular.

Reese's testimony established that Alice was below the first percentile in both height and weight as compared to children her age. Scroggins recognized that Alice was small. Numerous impartial witnesses testified that Alice was extremely small for her age and that her size caused them concern about her health. But Scroggins never took Alice to the doctor, even when she recognized Alice was sick.

Scroggins and Alvarez apparently kept Alice in the van almost all the time. Alice testified that she did not get to play in parks, and Scroggins testified that they did not "introduce" Alice to others until she and Alvarez became familiar with them. When confronted by law enforcement, Scroggins initially refused to leave the van or to produce the child, and when she did leave the van, she gave a false name. Even when Alice met someone, if she tried to talk, Scroggins would hush her. Conduct in which a defendant attempts to hide her culpability may be viewed as consciousness of guilt. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (false statements); *Taylor v. State*, No. 06-09-00128-CR, 2010 WL 2802455, at *4 (Tex. App.—Texarkana July 16, 2010, no pet.) (mem. op., not designated for publication) (interference with a child victim's communication with others); *Campos v. State*, 473 S.W.3d 907, 916 (Tex. App.—Amarillo 2015, no pet.) (unusual conduct or demeanor during an interview with law enforcement).

18

We conclude that, from the evidence produced at trial, including Scroggins's actions that could be interpreted as evidence of consciousness of guilt, the jury could rationally conclude that Scroggins recklessly committed an act or omission.

We overrule Scroggins's first issue.

### B.     Serious Bodily Injury

In her second issue, Scroggins claims the evidence is insufficient to prove that Alice suffered a serious bodily injury.

"'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(a)(46) (Supp.). "Whether an injury constitutes serious bodily injury is determined on a case-by-case basis." *Wade v. State*, 663 S.W.3d 175, 184 (Tex. Crim. App. 2022).

Reese testified that Alice's growth was stunted in that she was closer in size to a four- or five-year-old than to a ten-year-old. Reese testified that children who experience malnutrition will probably always lag behind their peers and will not usually make up that height later on. Reese testified that although Alice's laboratory results did not confirm her initial suspicion of protein calorie malnutrition, they did confirm that she was "very low in vitamin D, which is necessary for bone growth." Reese also testified that a child's lag in height due to malnutrition was a permanent impairment as were the accompanying cognitive delays.

The jury also heard testimony that Alice was unable to walk very far when she was initially removed. Barnett testified that someone would have to carry Alice to the cafeteria or to

19

the gym because she did not have the muscle strength to walk that far. Reese testified that muscle aches and weakness can both be symptoms of malnutrition.

Scroggins argues that the evidence at trial conclusively established that Alice's "size was *not* the result of severe malnutrition or a protein calorie deficiency." Scroggins correctly states that Reese testified that the laboratory results came back negative for protein calorie malnutrition, but Reese also testified that someone's laboratory results can come back as normal yet that person could still be malnourished. In fact, that would not be an uncommon situation, she said. We defer to the jury's "role as the sole judge of the weight and credibility of the evidence," *Braughton*, 569 S.W.3d at 608 (quoting *Adames*, 353 S.W.3d at 860), and we defer to the jury's resolution of "any conflicting inferences in favor of the verdict," *id.*

Scroggins also asserts that Alice's weakened muscles did not constitute "protracted loss or impairment." We need not address that argument. Reese testified that poor growth is a symptom of malnutrition and that stunted growth is permanent. That testimony is sufficient to establish that Alice suffered from a serious permanent disfigurement. *Cf. Bleimeyer v. State*, 616 S.W.3d 234, 242 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (concluding that a child's beginning stages of organ failure, permanently stunted height, and inability to walk when hospitalized formed the basis for the jury's rational conclusion that the child had suffered serious bodily injury).

Based on the evidence the State adduced at trial, the jury rationally concluded that Alice suffered serious bodily injury because Scroggins's failure to provide her with adequate food and

medical care created a substantial risk of death or caused serious permanent disfigurement or protracted loss or impairment of Alice's body and/or organs.

We overrule Scroggins's second issue.

## IV.    Conclusion

We affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:    July 21, 2025
Date Decided:    December 8, 2025

Do Not Publish